VIATCHESLAV G. ABRAMIAN *vs.* PRESIDENT & FELLOWS OF
HARVARD COLLEGE & others.[1]

Middlesex. February 11, 2000. - July 14, 2000.

Present: ABRAMS, LYNCH, IRELAND, SPINA, & COWIN, JJ.

*Employment,* Discrimination, Termination, Retaliation. *Anti-Discrimination
Law,* Employment, Termination of employment, Burden of proof, National
origin. *Practice, Civil,* Judgment notwithstanding verdict, Instructions to
jury, Conduct of counsel. *Federal Preemption. Waiver. Damages,* Punitive.

Evidence at the trial of an employment discrimination case warranted a find-
ing that an employer's reason for terminating an employee was a pretext
and that the disparate treatment received by the employee was motivated
by a discriminatory animus based on national origin. [113-115]

A Superior Court judge correctly ruled that, in an employment discrimination
action, the defendant employer waived its affirmative defense of Federal
preemption. [115]

This court undertook to reexamine the holding of *Blare* v. *Husky Injection
Molding Sys. Boston, Inc.,* 419 Mass. 437, 444-446 (1995), and stated that,
in an employment discrimination case in which the plaintiff demonstrates
that the employer's proffered reason for terminating the plaintiff is a
pretext, i.e., untrue, that gives rise to an inference of unlawful discrimina-
tion sufficient to withstand a motion for directed verdict and sufficient to
warrant a jury to return a verdict for the plaintiff; and that the employer
may rebut this inference by showing that there was no discriminatory
intent or that the employer's action was based on a different nondiscrimina-
tory reason. [115-118]

Where, in an action alleging unlawful employment discrimination based on
national origin, the judge instructed the jury in response to a question in
accordance with *Blare* v. *Husky Injection Molding Sys. Boston, Inc.,* 419
Mass. 437, 444-446 (1995), to the effect that they had to find for the
plaintiff if they determined that the defendants' proferred reason for
terminating the plaintiff's employment was a pretext, the jury was thereby
stripped of their fact-finding function: where there was a basis in the
evidence for concluding that the plaintiff was terminated for other than a
discriminatory reason, the defendants were entitled to a new trial. [117-119]

A Superior Court judge correctly allowed defendants' motion for a new trial
in an employment discrimination case on the issue of punitive damages,
where the judge concluded that his instructions could have allowed the
jury to award punitive damages without a finding that the defendants'
conduct was "outrageous." [119]

[1] Paul E. Johnson, Robert J. Dowling, and Thomas Henaghan.

At the trial of an employment discrimination case based on national origin, the judge properly allowed evidence of racial bias expressed by one defendant as relevant to the defendant's state of mind and credibility, and the judge properly allowed use of such evidence to impeach the defendant; further, plaintiff's counsel's pursuit of evidence of racial bias at trial did not constitute a basis for the grant of a new trial. [119-121]

In a retaliation claim brought under G. L. c. 151B, § 4 (4), arising from asserted employment discrimination, the evidence was sufficient for the jury to return a verdict for the plaintiff and the judge instructed the jury correctly on that claim. [121-122]

A retaliation claim was separate from and independent of the underlying discrimination in employment claim, on which the defendant was granted a new trial, but claims of intentional interference with contractual relations and aiding and abetting discrimination were, in the circumstances, so intertwined with or derivative of the discrimination claim that the defendant was entitled to a new trial on those claims as well. [122]

At a civil trial, the judge did not err in excluding evidence proffered to demonstrate an assertion that the proponent had no reasonable expectation of proving. [122-123]

CIVIL ACTION commenced in the Superior Court Department on October 14, 1993.

The case was tried before *James F. McHugh, III, J.*

The Supreme Judicial Court granted an application for direct appellate review.

*George Marshall Moriarty* (*Allan A. Ryan, Jr.,* with him) for the defendants.

*John J. Barter* (*John G. Swomley* with him) for the plaintiff.

The following submitted briefs for amici curiae:

*Michael E. Malamut* for Associated Industries of Massachusetts.

*Betsy L. Ehrenberg & James S. Weliky* for National Employment Lawyers Association, Massachusetts Chapter, & others.

SPINA, J. Viatcheslav G. Abramian (Abramian) brought a civil action against the president and fellows of Harvard College (Harvard), alleging that (1) he was discharged in February, 1993, from his employment as a security guard because of his national origin in violation of G. L. c. 151B, § 4 (1), and (2) he was harassed and eventually discharged in retaliation for his complaints about discriminatory acts directed at him because of his national origin in violation of G. L. c. 151B, § 4 (4). The jury returned verdicts against Harvard on both counts, and as to each count the jury awarded compensatory damages of $522,136

and punitive damages of $750,000. In response to special questions, the jury specified the components of compensatory damages as follows: (1) past lost wages — $116,866; (2) future lost wages — $155,270; and (3) emotional distress — $250,000.

Abramian named as additional defendants Paul E. Johnson, chief of police and security at Harvard (Johnson); Robert J. Dowling, manager of operations for the security department (Dowling); Thomas Henaghan, supervisor (Henaghan); and Timothy Carlow, a fellow security guard (Carlow). Abramian alleged, inter alia, that each individual defendant (1) aided and abetted acts of unlawful discrimination directed at him, G. L. c. 151B, § 4 (5), and (2) intentionally interfered with his employment relationship with Harvard. The jury returned verdicts for Johnson and against Dowling and Henaghan for aiding and abetting unlawful discrimination, and awarded punitive damages of $25,000. The jury returned verdicts against Johnson, Dowling, and Henaghan for intentional interference with an employment relationship, and awarded compensatory damages of $522,136. The jury were not asked to identify the components of this aspect of damages, as it had with respect to Harvard. The jury returned verdicts for Carlow on both counts. Abramian moved for attorney's fees and received an award of $161,181.01.

The defendants (other than Carlow) moved for judgment notwithstanding the verdict (judgment n.o.v.), Mass. R. Civ. P. 50 (b), 365 Mass. 814 (1974), in which they challenged the sufficiency of the evidence and raised a Federal preemption claim. The defendants also filed a motion for a new trial, Mass. R. Civ. P. 59 (a), 365 Mass. 827 (1974), contending, inter alia, that the judge gave incorrect burden-shifting instructions as to "pretext" and incorrect instructions as to punitive damages. The defendants also sought a new trial based on alleged repeated misconduct of Abramian's trial counsel. Finally, the defendants filed a motion to alter or amend judgment, Mass. R. Civ. P. 59 (e), 365 Mass. 827 (1974), challenging the damages as duplicative, and requesting that compensatory damages awarded against the individual defendants be broken into component parts, similar to what had been done for Harvard, to avoid calculation of prejudgment interest on future damages. The judge denied the defendants' motion for judgment n.o.v. and granted the defendants' motion for a new trial only as to the issue of punitive damages. The defendants' motion to alter or amend the judgment was allowed such that they would be jointly and

severally liable for compensatory damages; it was denied as to the individual defendants' request that compensatory damages be broken into components, and prejudgment interest was ordered on that entire amount. The defendants and Abramian appealed. We granted both applications for direct appellate review.

On appeal, the defendants claim that (1) the evidence was insufficient to warrant a finding of pretext; (2) the judge erroneously concluded that they waived their Federal preemption claim; (3) the judge gave an erroneous instruction as to the effect of a finding of pretext; (4) the judge's erroneous instructions of pretext and punitive damages require a new trial as to all issues; (5) they are entitled to a new trial because of repeated misconduct by Abramian's counsel; and (6) the calculation of prejudgment interest on the award of compensatory damages against the individual defendants was error. Abramian claims that the judge erred in (1) allowing the defendants' motion for a new trial as to punitive damages; (2) ordering certain subpoenas quashed; and (3) making certain evidentiary rulings. We affirm the judgment against Harvard on the count alleging retaliation, and vacate the other judgments.

1. *Background facts.* We summarize facts that the jury could have found.[2] Abramian, a white male born in Russia,[3] was hired by Harvard as a security guard in January, 1988. Abramian was one of approximately ninety security guards on the force. At the time Abramian was hired, Dowling maintained input into the hiring and disciplining of security guards, but did not have direct control. Dowling became manager of operations, with authority to hire and recommend the discipline of guards, in 1989. Henaghan was hired as a security guard in February,

---

[2]The standard for reviewing the denial of a motion for judgment n.o.v. is "whether 'anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff.' " *Boothby* v. *Texon, Inc.*, 414 Mass. 468, 470 (1993), quoting *Poirier* v. *Plymouth*, 374 Mass. 206, 212 (1978). This standard calls for a review of the evidence in the light most favorable to Abramian, "without weighing the credibility of the witnesses or otherwise considering the weight of the evidence." *Bavuso* v. *Caterpillar Indus., Inc.*, 408 Mass. 694, 695 n.1 (1990), quoting *McNamara* v. *Honeyman*, 406 Mass. 43, 45-46 (1989).

[3]Abramian is an ethnic Armenian from the State of Uzbekistan, part of the former Soviet Union. He entered the United States on a political asylum visa in 1984.

1989, and was promoted to supervisor in August of that same year. He was one of five men who supervised Abramian.

The first two years of Abramian's employment at Harvard were relatively uneventful except for three incidents. In November, 1988, he was found sleeping during his midnight to 8 A.M. shift, and was suspended for five days. The customary sanction for sleeping on post was a suspension of from two to three days. An American-born guard who was also found asleep at his post was disciplined with a letter of reprimand but no suspension. In January, 1989, Abramian was terminated after two Harvard custodial staff members complained that he had fallen asleep on post again. After his union steward investigated the matter during a grievance procedure, Abramian was reinstated with back pay in February, 1989, and the incident was ordered expunged from his personnel file. In May, 1989, a supervisor noted that Abramian had lost part of his uniform, but Abramian received no discipline as a result of this incident.

The harassment alleged by Abramian occurred between 1990 and 1993 after Henaghan had become a supervisor. In July, 1990, Henaghan submitted a written incident report into Abramian's personnel file that described Abramian on duty in his T-shirt rather than his uniform shirt. In April, 1991, Henaghan submitted a report that described Abramian wearing a summer uniform shirt opened to the fourth button and wearing civilian pants. In May, 1991, Dowling entered a "final warning" into Abramian's personnel file, citing a "substantial number of verbal warnings" for being out of uniform. In August, 1991, Henaghan submitted an incident report describing Abramian on duty wearing a uniform shirt open to the second button, no uniform belt, and a uniform shirt and pants in "a mass of wrinkles." Abramian testified that he never received copies of these written reports, and the jury could have found that the incident reports were false and were entered into Abramian's file without his knowledge, in violation of Harvard's personnel policy. From 1990 to 1993, Henaghan was the only supervisor to "write up" Abramian for being out of uniform.

During that same time period, Abramian was subjected to demeaning slurs about his national origin. In the presence of an unnamed supervisor, an unnamed guard called him a "bullshit Bolshevik" but no action was taken on the matter. Henaghan, in speaking about Abramian, said, "I'd like to send that fucking Russian back to Russia," and, "This Russian is nothing but

trouble." Fellow guard Carlow called him a "commie," and a "fucking Russian" as well. Henaghan also ridiculed Abramian for having an accent and attempting to practice his English skills. Carlow, while in the presence of Henaghan, called Abramian "fucking Rainman" in reference to the movie about an autistic man who "memorize[d] a lot of stuff."

Abramian's work environment also was tainted by his supervisors' pejorative references to the national origin of others. From the testimony of a guard of Portuguese descent, the jury could have found that Henaghan ridiculed the guard's name and the accent of the guard's mother. From his own testimony, the jury could have found that Henaghan purposefully declined immediately to reprimand another guard for referring to a supervisor of Italian descent as a "fucking little guinea." After Dowling received complaints about a guard whose native language was Spanish, he said, "We're trying to give him a job with his own kind, like the Dining Hall Service." There was testimony that Dowling expressed support, while in the workplace, for the 1992 presidential candidacy of David Duke, a former candidate for Governor of Louisiana in 1991 whose background included an affiliation with the Ku Klux Klan. Dowling condoned comments by other guards who referred to the holiday honoring the birthday of Dr. Martin Luther King, Jr., as "nigger day."

On February 17, 1992, Henaghan went to Abramian's work station and reprimanded him for not wearing a tie and ridiculed his accent. Abramian asked Henaghan to stop harassing him, but in response Henaghan threatened to beat him up and challenged him to meet him "outside" at the end of his shift. Abramian wrote a letter dated March 11 to Johnson complaining about the threats and harassment from Henaghan. On March 14, Henaghan wrote up Abramian for being tardy; on March 16, Henaghan wrote up Abramian for eating dinner at a coffee shop during his shift and wearing a civilian jacket; and on March 18, Henaghan wrote a note to Dowling claiming that Abramian had left numerous doors and windows open at the end of his shift. On April 2, a meeting presided over by Dowling was convened for the alleged purpose of discussing the harassment claimed by Abramian, but the result of the meeting was that Abramian was suspended without pay for three days for lying and being out of uniform and Henaghan was not asked to stop harassing Abramian. Although an arbitrator reduced the suspension to one

day for being out of uniform, Carlow and other American-born guards had received as many or more warnings than Abramian for being out of uniform, but only Abramian was suspended for being out of uniform.

On May 20, 1992, the Harvard Crimson, a student-run newspaper, ran an article[4] detailing how an unnamed Russian security guard (Abramian) was being harassed on a regular basis by his supervisors in the security division of the Harvard police department. After the article was published, Carlow told another guard that he would "help [Dowling] get rid of the — Russian, because he's causing a lot of problems."

On January 21, 1993, Abramian walked into the security office to pick up his paycheck and see if any new opportunities for promotion had been posted on the bulletin board. Dowling and Carlow were the only others present. As Abramian approached the bulletin board, Carlow blocked his way, and Abramian asked him to move. Carlow refused, looked at Dowling, told Abramian, "Get out from here, fucking Russian," and struck him and threatened to kill him. After this incident, witnessed by Dowling and reported to Johnson, Abramian was fired for committing assault and battery, filing a false report, and having a history of disciplinary actions.[5] Carlow, who had been a part-time guard, was promoted to a full-time position, inferably Abramian's. Although there had been other incidents of assaultive behavior between American-born guards, no other guard except Abramian actually had been terminated for assaultive behavior during Johnson's ten-year tenure[6] as chief of police.

2. *Motion for judgment notwithstanding the verdict.* (a) *Sufficiency of the evidence of pretext.* The defendants argue that the judge erred in denying their motion for judgment n.o.v. because the evidence did not support a finding that the reason advanced by Harvard for discharging Abramian was a pretext. They contend that there was no evidence that Dowling knew Carlow

---

[4]A redacted version of the article containing only Abramian's statements was introduced in evidence. Numerous other Harvard Crimson articles concerning race-based, ethnicity-based, and sex-based harassment in the Harvard security guard force that were published from 1991 to 1995 were marked for identification but not introduced in evidence.

[5]At trial Johnson testified that Abramian was fired because of the fight, and gave no other reason.

[6]Johnson became chief of police and security at Harvard in December, 1983, and remained there in that capacity until December, 1995.

started the fight with Abramian that led to his discharge, or that Dowling heard Carlow's disparaging remark about Abramian's national origin. They further contend that Abramian failed to "identify and relate specific instances where persons similarly situated 'in all relevant aspects' were treated differently." *Matthews* v. *Ocean Spray Cranberries, Inc.*, 426 Mass. 122, 129 (1997), quoting *Dartmouth Review* v. *Dartmouth College*, 889 F.2d 13, 19 (1st Cir. 1989).

The evidence warranted a finding of pretext. Although Abramian was discharged because he allegedly started the fight with Carlow, the jury could have concluded that Carlow started the fight with Dowling's approval. The fight occurred in front of Dowling, and the jury heard testimony that Carlow looked toward Dowling as if to seek approval before escalating the hostilities. The defendants rely on a statement Abramian allegedly gave to an investigator in which he was reported to have said that Carlow positioned himself so that Dowling would not be able to see or hear what occurred. The jury were not bound by this testimony, which was at odds with Abramian's trial testimony and could be discounted as a misunderstanding attributable to Abramian's difficulty with English. There was sufficient evidence for the jury to find that the reason given by Harvard for terminating Abramian was not true, which alone would have warranted a finding for Abramian, as we discuss at Part 3(a), *infra*.

The graphic evidence of discriminatory animus on the part of Dowling and Henaghan provides further support for a finding that Abramian was more likely than not the victim of unlawful discrimination. The derogatory references to Abramian's national origin and the denigration of other security guards because of their national origin indicate that Dowling and Henaghan were very likely biased against people of other nationalities, and that they carried out their responsibilities as supervisors by harassing such employees and tolerating an atmosphere of bigotry in the workplace.

There was also evidence that persons similarly situated were treated differently. Abramian was punished more severely than American-born guards for falling asleep on post, being out of uniform, and engaging in assaultive behavior. As noted, the jury could have concluded that it was Carlow who started the fight, and rather than being discharged, as was Abramian, he was promoted. The jury could have found that the treatment of

Abramian was motivated by discriminatory animus rather than a legitimate employment decision.

(b) *Waiver of Federal preemption claim.* The defendants argue that the judge erred in finding that they had waived their affirmative defense of preemption. They contend that Abramian's claim of wrongful interference with contractual relations is preempted by § 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (1994), where, as here, a collective bargaining agreement is involved. See *Magerer* v. *John Sexton & Co.*, 912 F.2d 525, 528 (1st Cir. 1990). The "majority of Federal courts have concluded that, where a Federal statute only controls what substantive law applies rather than the forum in which the matter must be adjudicated, preemption is a waivable affirmative defense." *Central Transp., Inc.* v. *Package Printing Co.*, 429 Mass. 189 (1999), and cases cited. Where the defendants first raised this defense in their motion for judgment n.o.v. and not in their motion for directed verdict, we agree with the trial judge that the defense is now waived. *Bonofiglio* v. *Commercial Union Ins. Co.*, 411 Mass. 31, 34 (1991), *S.C.*, 412 Mass. 612 (1992). There was no error in the denial of the defendants' motion for judgment n.o.v.

3. *Motion for a new trial.* (a) *Jury instructions.* On the second day of jury deliberations, the foreperson submitted the following question to the judge: "Question A1: We are confused after reviewing your instructions. If we believe that Harvard's rational[e] for firing Mr. Abramian is a pretex[t], are we therefore bound to answer yes[?]" Question A1, a special verdict question to which the foreperson's question was directed, read as follows: "Did Harvard College . . . discharge . . . Abramian, because of his national origin?" After conferring with all counsel, and over Harvard's objection, the judge sent the following written reply: "The answer to your question is 'Yes.' " Harvard argues that the instruction was error, claiming that in a "pretext only" jurisdiction such as Massachusetts, a finding of pretext *permits* but does not *compel* a finding of discrimination, and that even if the jury found that Harvard's rationale was a pretext, some other nondiscriminatory reason could have been the real reason, and thus a finding of pretext does not require a judgment for Abramian. Harvard made this same argument when it objected, thus the issue is preserved for appellate review. See *Flood* v. *Southland Corp.*, 416 Mass. 62, 66 (1993); *McCormick* v. *B.F. Goodrich Co.*, 8 Mass. App. Ct.

885, 887-888 (1979). The matter was thoroughly discussed and the defendants' position made sufficiently clear as to obviate any need for further objection after the jury were reinstructed. See Mass. R. Civ. P. 51 (b), 365 Mass. 816 (1974); *Flood* v. *Southland Corp., supra* at 67-68.

General Laws c. 151B, § 4 (1), provides in relevant part: "It shall be an unlawful practice . . . [f]or an employer, by himself or his agent, because of the . . . national origin . . . of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification." Applying the statute in these circumstances, where there is no direct evidence of discrimination, we follow a three-stage order of proof first set forth by the United States Supreme Court under the Federal anti-discrimination provisions of Title VII. See *Wynn & Wynn, P.C.* v. *Massachusetts Comm'n Against Discrimination,* 431 Mass. 655, 665-666 (2000); *Blare* v. *Husky Injection Molding Sys. Boston, Inc.,* 419 Mass. 437, 444-445 (1995); *Wheelock College* v. *Massachusetts Comm'n Against Discrimination,* 371 Mass. 130, 134-136 (1976), citing *McDonnell Douglas Corp.* v. *Green,* 411 U.S. 792 (1973). We are not, however, bound by interpretations of the Federal statute in construing our own State statute. *Blare, supra* at 441.

In the first stage, the employee has the burden to establish a prima facie case of discrimination by showing that "(1) he is a member of a class protected by G. L. c. 151B; (2) he performed his job at an acceptable level; (3) he was terminated; and (4) his employer sought to fill the plaintiff's position by hiring another individual with qualifications similar to the plaintiff's. . . . [T]he elements . . . may vary depending on the specific facts of a case." *Id.* The prima facie case "eliminates the most common nondiscriminatory reasons for the plaintiff's rejection," which are lack of competence and lack of job availability, and thereby creates a presumption of discrimination. *Id.,* quoting *Texas Dep't of Community Affairs* v. *Burdine,* 450 U.S. 248, 254 (1981).

In the second stage, the employer can rebut the presumption by articulating "a lawful reason or reasons for its employment decision [and] produc[ing] credible evidence to show that the reason or reasons advanced were the real reasons." *Blare, supra*

at 442, quoting *Wheelock College, supra* at 138. The information provided at this stage also serves to "narrow the field of possible lawful reasons" for the decision. *Blare, supra* at 445, quoting *Trustees of Forbes Library* v. *Labor Relations Comm'n*, 384 Mass. 559, 566 (1981). The employer need not prove that the reasons were nondiscriminatory, *Matthews* v. *Ocean Spray Cranberries, Inc., supra* at 128; *Blare, supra* at 441-442, but "the defendant nevertheless retains an incentive to persuade the trier of fact that the employment decision was lawful. Thus, the defendant normally will attempt to prove the factual basis for its explanation." *Texas Dep't of Community Affairs* v. *Burdine, supra* at 258. If the employer fails to meet its burden of production at stage two, the presumption created by the evidence supporting a prima facie case "*entitles* [the] plaintiff to judgment" (emphasis added). *Blare, supra* at 442. If the employer meets its burden of production at stage two, the presumption created by the prima facie case drops from the case and the proceedings advance to the third stage. *Id.* at 442-443.

At the third stage the employee must show that the basis of the employer's decision was unlawful discrimination. See *Blare, supra* at 442-443, 446. This may be accomplished by showing that the reasons advanced by the employer for making the adverse decision are not true. *Id.* at 443, 444-445. *Wheelock College, supra* at 139. In *Blare*, we said that under "[t]he pretext only rule . . . a plaintiff who has established a prima facie case and persuaded the trier of fact that the employer's articulated justification is not true but a pretext, is *entitled* to judgment" (emphasis added). *Blare, supra* at 443. We even repeated this formula. *Id.* at 444-445. It would be hugely unfair to criticize the trial judge for following such emphatic language, which we acknowledge has been a source of much confusion.[7] Literally applied, that language improperly compels a verdict for the plaintiff. See *McDonough* v. *Metropolitan Life Ins. Co.*, 228 Mass. 450, 452-453 (1917). We never intended this result. While there is some appeal in an instruction that *requires* a jury to find for a plaintiff who shows that the employer's reasons are untrue

---

[7]Some of the confusion flows from the use of the terms "pretext only" and "pretext plus." The Federal courts, which adhere to a "pretext plus" rule, have not escaped this confusion. Compare *St. Mary's Honor Ctr.* v. *Hicks*, 509 U.S. 502, 523-524 (1993) (showing of pretext alone insufficient to meet plaintiff's burden), with *Reeves* v. *Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000) (showing of pretext alone is evidence of discrimination which may be sufficient to meet plaintiff's burden).

(the employer should not be in a better position for advancing untruthful reasons than for offering none at all during stage two, see *Blare, supra* at 443), the instruction should not have been given because it stripped the jury of its fact-finding role. See *McDonough* v. *Metropolitan Life Ins. Co., supra.*

In *Wheelock College*, which we followed in *Blare*, we said "[t]he burden of proof of unlawful discrimination rests at all times with the complainant. He may meet that burden by establishing an unanswered prima facie case of discrimination. He may also meet that burden by proving by a preponderance of the evidence that the respondent's facially proper reasons given for its action against him were not the real reasons for that action." *Wheelock College* v. *Massachusetts Comm'n Against Discrimination, supra* at 139. Such a showing "*warrants* a determination that the plaintiff was the victim of unlawful discrimination" (emphasis added). *Blare, supra* at 446. It is "our experience that more often than not people do not act in a totally arbitrary manner, without any underlying reasons, especially in a business setting. Thus, when all legitimate reasons . . . have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts only with *some* reason, based his decision on an impermissible consideration . . ." (emphasis in original). *Blare, supra* at 446, quoting *Furnco Constr. Corp.* v. *Waters*, 438 U.S. 567, 577 (1978).

Evidence that the employer's reasons are untrue gives rise, therefore, to an inference that the plaintiff was a victim of unlawful discrimination. That inference, together with the elements described in stage one, establishes a prima facie case sufficient to withstand a motion for directed verdict under Mass. R. Civ. P. 50 (a), 365 Mass. 814 (1974). Together they provide sufficient basis for the jury to return a verdict for the plaintiff. See *Blare, supra* at 446. The employer may counter the effect of this evidence by showing that, even if his articulated reason for the adverse action is untrue, he had no discriminatory intent, or that his action was based on a different, nondiscriminatory reason. Correspondingly, the plaintiff is not limited to the falsity of the employer's articulated reasons in proving discrimination.

The erroneous instruction here was prejudicial. There was evidence from which the jury could have concluded that the real reason Abramian was fired was neither the fight with Carlow nor a discriminatory animus, but Abramian's refusal to play

into a scheme of cronyism. While the evidence of cronyism itself could be viewed as a symptom of bigotry, the question properly is one for the jury. Because "we cannot ascertain on which theory the jury relied, the verdict [on the discrimination count] cannot stand." *Slate* v. *Bethlehem Steel Corp.*, 400 Mass. 378, 384 (1987). Harvard is entitled to a new trial on the count alleging discrimination. See *Schrottman* v. *Barnicle*, 386 Mass. 627, 631 (1982); *Franklin* v. *Albert*, 381 Mass. 611, 612 (1980).

(b) *Punitive damages.* Prior to deliberations, the judge instructed the jury that they could award punitive damages if they found that the defendants' conduct was "offensive or outrageous." Shortly before the end of the trial, we decided *Dartt* v. *Browning Ferris Indus., Inc. (Mass.)*, 427 Mass. 1 (1998), which held that punitive damages could be awarded if the defendant's conduct was found to be "outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." *Id.* at 17a, quoting Restatement (Second) of Torts § 908(2) (1979). After posttrial motions, the judge agreed with the defendants that his instruction could have allowed the jury to award punitive damages without a finding of outrageousness, and accordingly ordered a new trial as to punitive damages. Abramian has appealed from this ruling. There was no error.

(c) *Conduct of Abramian's counsel.* The defendants argue that Abramian's counsel's repeated, improper interjection of racial issues necessitates a new trial. Counsel continued to offer evidence of racial bias after the judge had ruled that it would be inadmissible in this case, which alleged discrimination on the basis of national origin.

In deciding the motion for a new trial the experienced judge acknowledged that his original ruling was "not one that is free from doubt," and that "the line between excluded evidence of racial bias and admissible evidence of bias regarding national origin is not a bright one." Following a voir dire and an offer of proof at trial the judge carefully and thoughtfully permitted the racial bias testimony to be introduced as "relevant to the kind of supervision and tone Mr. Dowling set and tolerated in sensitive matters regarding employee backgrounds . . . and material to a jury determination of the truth of plaintiff's contentions that Mr. Dowling knowingly overlooked discrimination practiced by others under his supervision."

That testimony consisted of the plaintiff's cross-examination of Dowling on his open support among guards of the policies of

David Duke, whose membership in the Ku Klux Klan drew national attention to his campaign for the Governorship of Louisiana in 1991. When Dowling denied any such support, counsel was permitted to impeach him with the testimony of a former guard who is African-American, and who testified about a conversation he had with Dowling at the workplace concerning David Duke. The witness testified that Dowling agreed that it was acceptable to burn crosses in front of the homes of African-Americans. The evidence was relevant for the reasons stated by the judge. The decision to admit the evidence was not plainly wrong. See *Green* v. *Richmond*, 369 Mass. 47, 59 (1975), and cases cited.

The defendants further argue that this was impermissible impeachment of Dowling on a collateral matter by extrinsic evidence, citing *Leone* v. *Doran*, 363 Mass. 1, 15-16, modified on other grounds, 363 Mass. 886 (1973). The rule in that case is premised on the practical need to keep the trial of cases from getting out of control. *Id.* Notwithstanding, a judge may, within his discretion, permit impeachment on collateral matters by extrinsic evidence. See *Commonwealth* v. *Ferguson*, 425 Mass. 349, 355-356 (1997) (rebuttal testimony contradicting murder defendant on collateral issue of his treatment of female employees properly admitted because it affected his credibility). There was no abuse of discretion.

On at least two occasions during the trial, the judge and counsel for both parties discussed the possibility of a mistrial, but defense counsel opposed the suggestion. At one point counsel for the defendants said, "I don't want a mistrial. I want to win the trial, frankly, your Honor." The defendants did not move for a mistrial at any point in the proceedings when evidence of racial bias was admitted, which we view as an indication that any prejudice was minimal. "The declaring of a mistrial is ordinarily within the discretion of the trial judge, who is in the best position to determine whether or not anything has happened [that is] likely to affect the justice of the verdict." *Curley* v. *Boston Herald-Traveler Corp.*, 314 Mass. 31, 31-32 (1943). See *Dobos* v. *Driscoll*, 404 Mass. 634, 645, cert. denied sub nom. *Kehoe* v. *Dobos*, 493 U.S. 850 (1989); *Riley* v. *Davison Constr. Co.*, 381 Mass. 432, 444 (1980). In view of defense counsel's comments at trial, together with the judge's implicit finding that the conduct of Abramian's counsel was not "unfairly prejudicial" to the defendants, see *Graci* v. *Damon*, 6

Mass. App. Ct. 160, 167, *S.C.*, 376 Mass. 931 (1978), the denial of the motion for a new trial based on counsel's pursuit of evidence of racial bias was not error.

4. *Cumulative effect of erroneous jury instructions.* The defendants argue, citing many Federal cases, that the erroneous instructions in response to the jury's question on pretext and the erroneous punitive damages instruction are inextricably intertwined with the issues of liability and compensatory damages on all counts, and thus a new trial cannot be limited to punitive damages but must be on all issues. We disagree.

Unlike the Federal courts, Massachusetts trial judges have long been given the express authority to decide motions for a new trial, and to permit retrials on the issue of damages. See *Labonte* v. *Hutchins & Wheeler*, 424 Mass. 813, 826-827 (1997). Compare Fed. R. Civ. P. 59 (a) with Mass. R. Civ. P. 59 (a), and J.W. Smith & H.B. Zobel, Rules Practice § 59.14 (1977 & Supp. 2000). We consider the various counts.

Retaliation is a separate and independent cause of action. General Laws c. 151B, § 4 (4), prohibits retaliation by making it unlawful for "any person . . . to discharge, expel or otherwise discriminate against any person because he has opposed any practices" forbidden under G. L. c. 151B. See G. L. c. 151B, § 4 (4A) (it shall be an unlawful practice for "any person to coerce, intimidate, threaten, or interfere with another person in the exercise or enjoyment of any right" to complain of discrimination that is prohibited by any provision of G. L. c. 151B). To succeed on a claim of retaliation, "the plaintiff must prove that [he] reasonably and in good faith believed that the [employer] was engaged in wrongful discrimination, that [he] acted reasonably in response to [his] belief, and that the [employer's] desire to retaliate against [him] was a determinative factor in its decision to terminate [his] employment." *Tate* v. *Department of Mental Health*, 419 Mass. 356, 364 (1995). There was sufficient evidence to permit the jury to conclude that Abramian reasonably and in good faith believed that Harvard was discriminating against him because of his national origin, that his attempt to confront Henaghan, his letter to Johnson, and his disclosures to the Harvard Crimson newspaper were reasonable responses to his belief, and that Harvard's desire to retaliate against him because of those acts was a determinative factor in Harvard's decision to terminate him. The judge's charge on retaliation was an accurate statement of

the law, including his statement that the jury may find retaliation "even if there was no discrimination." There was no objection to the instruction. The elements of discrimination and retaliation did not intersect. Properly instructed and acting under those instructions, the jury's verdict on discrimination could not have affected their verdict on retaliation.

The fate of the verdicts on intentional interference with contractual relations, and aiding and abetting discrimination, is otherwise. In an action for wrongful interference with contract the plaintiff must prove that the plaintiff had a contract with a third party, the defendant knowingly induced the third party to break that contract, the defendant's interference was improper in motive or means, and the plaintiff was harmed by the interference. See *G.S. Enters., Inc.* v. *Falmouth Marine, Inc.*, 410 Mass. 262, 272 (1991). As the jury were expressly instructed that discrimination on the basis of national origin could provide a basis for finding improper motive or means in interfering with a contract, we cannot say that the jury did not base this verdict on their discrimination verdict. A new trial is required on this count. See *Slate* v. *Bethlehem Steel Corp.*, 400 Mass. 378, 384 (1987). The same result is required as to aiding and abetting discrimination. It is a claim entirely derivative of the discrimination claim, so the verdict on that count likely was affected by the verdict on discrimination.

5. *Motion to alter or amend judgment.* The defendants argue that the judge erred in awarding prejudgment interest on the lump-sum compensatory figure of $522,136 against the individual defendants, particularly in light of the fact that it awarded prejudgment interest only on the past lost wages figure of $116,866 against Harvard. In light of our holding in Part 4, *infra*, we need not decide this question.

6. *Abramian's appeal.* Abramian raises two arguments in his appeal. First, he contends that the original punitive damages awarded by the jury should be reinstated. As discussed in Part 3(b), *infra*, there was no error in the order for a new trial on the question of punitive damages.

Abramian next argues that "relevant and material" evidence that was excluded at trial should be allowed in evidence at any retrial. Specifically, he argues that the judge should not have allowed the defendants' motion to quash Abramian's subpoena of certain witnesses, including Harvard's then general counsel. Abramian wanted the witnesses to appear in order to attempt to

prove that Harvard used the Ring Report,[8] a document not admitted in evidence but which states that there is no discrimination at the Harvard security guard service, to conceal its discriminatory conduct. The judge found that there was no good faith basis for Abramian to believe that the proposed witnesses' testimony would help unearth the alleged conspiracy, and that he would not be allowed to treat direct examination as if it were discovery. Indeed, a lawyer must not pursue a line of questioning when there is no reasonable expectation of being able to prove the matters to which the line refers. See Mass. R. Prof. C. 3.4(e), 426 Mass. 1389 (1998). There was no offer of proof. In the absence of an offer of proof, Abramian has failed to show that he was prejudiced by the ruling. See *Cooke* v. *Walter Kidde & Co.*, 8 Mass. App. Ct. 902, 903 (1979). There was no error.

In summary, the judgment against Harvard on the count alleging retaliation is affirmed. The judgment against Harvard on the count alleging discrimination is vacated and that matter, together with the question of punitive damages, is remanded to the Superior Court for further proceedings consistent with this opinion. The judgments against Johnson, Dowling, and Henaghan on the count alleging intentional interference with contractual relations, and against Dowling and Henaghan on the count alleging aiding and abetting discrimination, are vacated and the matters remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*

Justice Lynch participated in the deliberation on this case, but retired before the opinion was issued.

---

[8]In or about January, 1993, Harvard's general counsel commissioned a law firm to investigate the Harvard Crimson newspaper article and other allegations of discrimination, and the firm concluded that no discrimination had occurred. Report of Special Counsel Concerning Discrimination Claims Regarding Harvard University Guard Service (Ring Report), dated July 30, 1993, was marked for identification but not entered in evidence.