SUPERIOR COURT 
 
 MOHAMMAD BAKHTIAR vs. INFINEON TECHNOLOGIES AMERICAS CORP., and others[1]

 
 Docket:
 1785CV00436
 
 
 Dates:
 May, 29 2019
 
 
 Present:
 /s/Valerie Yarashus Justice of Superior Court
 
 
 County:
 WORCESTER, ss.
 

 
 Keywords:
 '
 
 

 I.          INTRODUCTION
            The plaintiff, Mohammad Balditiar ("Bakhtiar"), brings this action claiming employment discrimination and retaliation by his former employer, Infmeon Technologies Americas Corp. ("Infmeon"), and his former supervisor, Derek Richardson ("Richardson"). Bakhtiar alleges that despite a long and positive work history at Infuieon, he suffered discrimination upon being assigned Richardson as his supervisor. Under Richardson's supervision, Bakhtiar received his first negative work reviews at the company and was ultimately terminated as part of a "reduction in force," that Bakhtiar now alleges was pretextual. Bakhtiar asserts claims of discrimination on the basis of race and national origin in violation of G.L. c. 151B, § 1, and retaliation in violation of G.L. c. 151B, § 1. The defendants have filed a motion for summary judgment requesting dismissal of all counts. For the following reasons, the defendants' Motion is DENIED.
---------------------------
[1] Derek Richardson
                                                            -1-
II. BACKGROUND
            The following facts are taken from the summary judgment record, which includes the pleadings, deposition transcripts, answers to interrogatories, admissions on file, and affidavits. The evidence is viewed in the light most favorable to the nonmoving party. Attorney Gen. v. Bailey, 386 Mass. 367, 370 (1982).
            Bakhtiar was hired as a senior process engineer by a predecessor entity to Infineon in 2008. He worked for the same company previously in an unspecified position. Between 2008 and 2014, Bakhtiar received generally positive performance reviews, performance bonuses, and was never disciplined. For example, his review for 2014 indicated that he "exceeds expectations." Managers and co-workers provided positive statements about Bakhtiar's work performance. Bakhtiar's work experience at Infineon was positive up through April 2015.
            In April 2015, Richardson was assigned to be Balchtiar's manager and Bakhtiar began reporting to him. From the time he began reporting to Richardson, Bakhtiar noticed that he was being treated differently than other engineers who reported to Richardson. Bakhtiar identifies as non-Caucasion based upon race, and identifies his national origin as Iranian. With the Caucasian engineers, Richardson "made time for them," communicated with them, and appeared to enjoy working with them. Bakhtiar noticed that Richardson did not make the same effort to get to know him and was not receptive to Bakhtiar's attempts to communicate and get to know Richardson.
            In April 2015, Bakhtiar began working on a "Lead Bend Project." Balchtiar's communications to Richardson about the project were met with negative feedback about the completion of the project. On June 22, 2015, Richardson wrote a document indicating that Balchtiar's performance was "not meeting expectations." Bakhtiar did not believe the negative
                                                            -2-
feedback from Richardson to be based on the merits of his work, but instead on discriminatory animus.
            Two days after receiving the June 22 document drafted by Richardson, Bakhtiar met with the company's Human Resources Manager, Patricia Briscoe ("Briscoe"), and Vice President of Operations, Michael Robinson ("Robinson"). Bakhtiar told Briscoe that he was concerned that Richardson's assessment of his job performance was incorrect, and that he was being treated differently from other engineers supervised by Richardson.[2] At the meeting, Briscoe offered to look for another position for Bakhtiar under a different manager, but another position never materialized.
            Bakhtiar believed that his communication with Briscoe was a formal complaint about the disparate treatment he felt he was receiving from Richardson. Infineon's employee handbook instructs employees to report incidents of discrimination and to speak with the Human Resources Department about them.
            Bakhtiar continued to work on the Lead Bend Project. He completed the project and emailed his results to Richardson on July 31, 2015, prior to the deadline Richardson assigned.[3] Bakhtiar continued to work on other projects under Richardson's supervision. Their relationship did not improve.
            In September 2015, Bakhtiar received a performance bonus. According to Bakhtiar, it was the lowest bonus he had ever received while working for Infineon. Bonuses were determined, in at least part, by the feedback provided by the employee's supervisor. On July 7,
---------------------------
[2] Defendants dispute whether Bakhtiar's communicated concern at the June meeting indicated to Briscoe that he felt he was "being discriminated against."
[3] Defendants dispute that the project was complete based on Richardson's testimony that it was "only 50 percent complete" by July 31, 2015.
                                                            -3-
2015, Richardson gave Bakhtiar a score of "1," the lowest score being "0," when asked by his supervisor to rate Bakhtiar for his bonus. Richarson also communicated to his supervisor that he wanted Bakhtiar "gone" at that time.
            Bakhtiar met with Briscoe on September 30, 2015 to discuss what he viewed as an unjustifiably low bonus. At that meeting, he again complained about being treated differently than other engineers by Richardson and complained that Richardson's behavior was discriminatory. Bakhtiar requested a follow up meeting with Briscoe in December 2015, but no follow up meeting occurred. Between October 2015 and June 2, 2016, Bakhtiar continued to work for Infineon without any discipline or performance improvement plan.
            On June 2, 2016, Bakhtiar was terminated from his position with Infineon. Infineon stated that the termination was a result of a "reduction in force" in order to "achieve cost savings." Bakhtiar alleges the company posted a job opportunity in the days following his termination for a position nearly identical to his terminated position. Infineon disputes that the posted job was "nearly identical" and alleges the position was posted prior to Bakhtiar's termination.
            In connection with Infineon's cost-cutting program, a panel of four managers, including Richardson, was appointed to review and rate the performance of all "indirect labor" (i.e., non-manufacturing) employees, including the process engineering group where Bakhtiar worked. Bakhtiar agreed in his deposition that the other three managers were "in a position to assess his performance," and had no reason to believe any of the other panelists were racist. Each of the four panelists rated all 161 "indirect labor" employees on a scale from one to five, with one being the highest score. Bakhtiar received a score of 4.25. Bakhtiar was selected as One of two employees in the process engineering group to be terminated based upon this score.
                                                            -4-
            In total, Infineon terminated sixteen employees at the facility where Bakhtiar worked. Thirteen of the employees were Caucasian. The record does not reveal whether the other terminated employee from the process engineering group was Caucasian. Before the June 2, 2016 terminations, the workforce at Infineon's facility was 68.9 percent Caucasian. After the terminations, the workforce at Infineon's facility was 68.1 percent Caucasian. The record contains no evidence concerning the national origin of Infineon's workforce, or Bakhtiar's work group, before or after the layoffs.
III. DISCUSSION
A. Standard of Review
            Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Mass. R. Civ. P. 56(c); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 714 (1991); Cassesso v. Commissioner of Corr., 390 Mass. 419, 422 (1983). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue and that the summary judgment record entitles the moving party to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The moving party may satisfy this burden by submitting affirmative evidence negating an essential element of the opposing party's case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. Flesner v. Technical Commc'ns Corp., 410 Mass. 805, 809 (1991); Kourouvacilis, 410 Mass. at 716. Once the moving party establishes the absence of a triable issue, the party opposing the motion must respond with evidence of specific facts establishing the existence of a genuine dispute. Pederson, 404 Mass. at 17. The nonmoving party, however, cannot rest on his or her pleadings and mere assertions of disputed facts to defeat the motion for summary judgment. LaLonde v.
                                                            -5-
Eissner, 405 Mass. 207, 209 (1989). "[B]are assertions and conclusions. . are not enough to withstand a well-pleaded motion for summary judgment." Polaroid Corp. v. Rollins Envtl. Servs., Inc., 416 Mass. 684, 696 (1993).
            In deciding a motion for summary judgment, the court considers the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in their favor. See Mass. R. Civ. P. 56(c).
B. Racial / National Origin Discrimination in violation of G.L. c. 151B 
            In a G. L. c. 151B racial discrimination case, the plaintiff has the burden of persuading the fact finder that the employer intentionally discriminated against him or her on account of race, Lewis v. Area II Homecare for Senior Citizens, Inc., 397 Mass. 761, 765 (1986), Wheelock College v. Massachusetts Comm 'n Against Discrimination, 371 Mass. 130, 139 (1976), and that the defendant would not have taken the action taken "but for" the unlawful discrimination. Lewis, 397 Mass. at 770; Smith College v. Massachusetts Comm 'n Against Discrimination, 376 Mass. 221, 227 n.8 (1978). The plaintiff "may meet that burden by establishing an unanswered prima facie case of discrimination." Wheelock College, 371 Mass. at 139. The plaintiff may establish a prima facie case, for example, by showing (1) that he belongs to a racial minority, (2) that he was employed by the defendant in a position for which he was qualified and performed adequately, (3) that he was suspended or terminated, and (4) that the defendant employer thereafter sought to fill that position with a similar qualified person. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Lipchitz v. Raytheon Company, 434 Mass. 493, 502 (2001); Wheelock College, 371 Mass. at 135 n.5. The elements may vary depending on the specific facts of a case. Abramian v. President & Fellows of Harvard College, 432 Mass. 107, 116 (2000). For example, a plaintiff in a reduction in force case may satisfy the fourth element
                                                            -6-
of his prima facie case by producing some evidence that his layoff occurred in circumstances that would raise a reasonable inference of unlawful discrimination. Sullivan V. Liberty Mutual Ins. Co., 444 Mass. 34, 45 (2005). "The prima facie case eliminates the most common nondiscriminatory reasons for the plaintiff's rejection, which are lack of competence and lack of job availability, and thereby creates a presumption of discrimination (internal citations omitted)." Abramian, 432 Mass. at 116.
            The employer can rebut the presumption of discrimination by articulating a lawful reason for its employment decision and producing credible evidence to show that the reason advanced was the real reason for its employment decision. Id. If the employer produces credible evidence of a non-discriminatory reason for its employment action, then the burden shifts back to the employee to show that the employer's proffered reason for making the employment decision is not true. Id. at 117. "[I]n an indirect evidence case, we permit the fact finder to infer discriminatory animus (and causation) from proof that the employer offered a false reason for the adverse employment decision." Lipchitz, 434 Mass. at 502.
            In cases where the employer considers both illegitimate and legitimate factors at the time of making a decision, but the plaintiff presents strong evidence "that [the] decision was 'because of" the illegitimate reason, the burden of proof is treated differently (internal citations omitted). Haddad v. Wal-Mart Stores, Inc., 455 Mass. 91, 112-113(2009). In these "mixed motive" cases, the defendant bears the burden of persuasion that it would have taken the same action absent the unlawful motive. Id. at 113. "Under a mixed motive analysis, where the plaintiff first proves that a proscribed factor played a motivating part in the challenged employment decision, 'an employer may not prevail [merely] by showing. . . a legitimate reason for its decision; the employer instead must show that its legitimate reason, standing alone, would have induced it to
                                                            -7-
make the same decision (internal citation omitted)." Id., citing Wynn & Wynn, P.C. v. Massachusetts Comm 'n Against Discrimination, 431 Mass. 655, 666 (2000).
            It is undisputed that Bakhtiar is a member of a protected class because he is non-Caucasian and he is a minority of Middle Eastern descent (Iranian). Bakhtiar was harmed by an employment decision because he was terminated. He has, therefore, satisfied two prongs of his prima facie case for discrimination. Defendants do not challenge that Bakhtiar was qualified for his position, instead arguing that his job performance justified the treatment he received from his supervisor, his lower bonus in September 2015, and his selection as one of two employees from his group to be terminated as part of the reduction in force.
            It is undisputed that Bakhtiar was never disciplined for his job performance, or given any "performance improvement plan," though there are comments in his reviews prior to 2015 about areas he could improve, such as time management. Nevertheless, it is undisputed that prior to April 2015, Bakhtiar enjoyed a generally positive reputation for his work at Infineon. The primary source of Richardson's criticism of Bakhtiar arose from his performance on the "Lead Bend Project." Richardson complained that Bakhtiar was not completing the project "in a timely manner." Bakhtiar completed the project and turned it over to Richardson on July 31, 2015, prior to the assigned due date. Nearly a month later, on August 24, 2015, Richardson communicated to Briscoe that Bakhtiar's work was not acceptable, and that the project was "only 50 percent complete." There are no facts in the record establishing that Bakhtiar missed any deadlines on the project, or from which the court can conclude that Bakhtiar's work was not acceptable or timely. There is a clear dispute of fact over whether the "Lead Bend Project" was completed in a timely and acceptable manner that requires a fact-finder's evaluation of the evidence concerning Bakhtiar's performance. Bakhtiar has met his burden of production that he
                                                            -8-
performed his work in a satisfactory manner by producing evidence of positive work performance reviews for all years prior to his assignment of Richardson as his supervisor. Further, the quick decline in Richardson's view of Bakhtiar's work between April and June of 2015, after a prolonged period of generally positive performance reviews by others, is enough to raise the inference that such an abrupt change was based upon something other than Bakhtiar's work performance.
            Turning to the fourth element, the same evidence of prolonged positive work performance, followed by a sudden shift that correlates to the assignment of Richardson as supervisor, is enough for Bakhtiar to demonstrate that his layoff occurred in circumstances that would raise a reasonable inference of unlawful discrimination. See Sullivan, 444 Mass. at 45. This is especially so where Richardson, his direct supervisor, sat on the review panel responsible for the reduction-in-force evaluations. See Mole v. Univ. of Massachusetts, 442 Mass. 582, 599 (2004). As there is conflicting evidence concerning the defendant's motive for the rather sudden poor performance evaluations that led to Bakhtiar's termination, the fourth prong of Bakhtiar's prima facie case is satisfied. See Lipchitz, 434 Mass. at 499 ("The ultimate issue of discrimination, raised by the parties' conflicting evidence as to the [defendants] motive, is not for a court to decide on the basis of briefs and transcripts, but is for the fact finder after weighing the circumstantial evidence and assessing the credibility of the witnesses.").
            Defendants next rebut the prima facie case by proffering the reduction in force procedure as a lawful reason for Bakhtiar's termination. For the same reasons discussed above, there is conflicting evidence whether the sudden decline in Bakhtiar's performance evaluations was based on actual work performance or an improper motive by his direct supervisor, Richardson. While the reduction-in-force panel had three members whose motives are not in question, a fact-
                                                            -9-
finder is needed to assess the credibility of each and determine what role Richardson's conduct toward Bakhtiar from April 2015 forward played in their decisions to assign Bakhtiar relatively low scores. Viewing panel layoff decisions through a mixed-motive lens seems to be particularly appropriate in a case like this, where some decisionmakers' motives may have been discriminatory and other decisionmakers' motives may not have been. See Haddad, 455 Mass. at 112-113. Moreover, even the non-discriminatory decisionmalcers may have had their evaluations infected by the allegedly discriminatory views of Richardson. See Mole, 442 Mass. at 599 (2004).[4] [5]
            The defendants believe that at least one important issue in the instant case, whether the alleged discriminatory intent of a supervisor can be attributed to independent third persons who play a role in the adverse employment action, is controlled by Mole, 442 Mass. 582, and Connolly v. Suffolk County Sheriff's Dept., 62 Mass App. Ct 187 (2004). These two cases contain a statement of some of the legal principles which would apply at trial to this case. However, they are factually distinguishable and not directly on point in a way that would compel summary judgment to be granted in favor of the defendants. It is also worth noting (although not
---------------------------
[4] This is sometimes referred to as "cat's paw" theory. See Moser v. Cheney, 2014 Mass. Super. LEXIS 72, *13-16 (May 4, 2014) (Curran, J.). "In cases involving a multilevel decision-making process and neutral decision maker[s], an employer remains liable under c. 151B if a supervisor, motivated by discriminatory animus, provided the decision maker with inaccurate, misleading, or false information and the decision maker relied upon this information in forming his decision. []. However, '[t]he mere fact that a [discriminatory] supervisor provides some of the information on which a decision is based, or initially recommends the adverse employment action to someone higher up in the organization, does not necessarily mean that the decision maker lacks sufficient independence from the supervisor for these purposes.' []. Thus, the plaintiff must show that the information provided by the supervisor 'was a material and important ingredient in causing [the adverse employment action] to happen' (internal citations omitted)." Id. at 15-16. Where Bakhtiar has provided evidence that the biased panel member was the primary source for his work reviews in the year prior to the reduction in force, a jury could reasonably conclude that those biased reviews had a material impact on the other panel members' evaluations of him.
[5] In the criminal context, "[t]he presence of even one biased deliberating juror is sufficient to deprive a defendant [of the constitutional right to a trial by a fair and impartial jury] and to require a new trial." Corn. v. Prunty, 462 Mass. 295, 304 (2012). By analogy, it seems fair to allow the plaintiff to make the argument that the panel which ranked his performance — where this determination resulted in his layoff— was tainted by a biased evaluator, i.e, the supervisor who had already been informed that the plaintiff was accusing him of discrimination.
                                                            -10-
determinative) that neither of those cases were resolved by means of summary judgment, but rather both of those cases were reviewed after either a jury trial or an MCAD hearing with factual determinations.
            The defendants point out that the reduction in force left the employer with a pool composed of fewer Caucasian employees than before the layoffs: 68,9 versus 68.1 percent. However, this does not fully answer the question of whether impermissible bias and/or retaliation caused the defendants to lay off Bakhtiar in light of the other evidence that he has proffered. This statistical evidence also does not answer the question whether Bakhtiar was laid off because of a combination, i.e., the "intersectionality," of his race and his national origin. See, e.g., Historical Perspectives: Intersectionality and Title VII: A Brief (Pre-) History, 95 B.U. L. Rev. 713 (May 2015); Multiple Disadvantages: An Empirical Test of Intersectionality Theory in EEO Litigation, 45 Law & Soc'y Rev. 991 (December 2011). It is certainly plausible that a discriminating supervisor or company may act in a more discriminatory manner when an individual belongs to two protected categories (here, race and national origin) than one. Therefore, the statistics Defendants have offered in their summary judgment materials do not settle the question of whether Bakhtiar will be able to prove discrimination in this case, where there is sufficient evidence supporting the inference of discrimination based upon race and/or national origin.
            Lastly, Bakhtiar directly disputes whether his performance on the "Lead Bend Project," the primary basis identified in the record for Richardson's poor reviews, was unsatisfactory. Bakhtiar thus argues that the employer has offered a "false reason" (poor job performance) for the adverse employment decision. See Lipchitz, 434 Mass. at 502.
                                                            -11-
            For the above reasons, Bakhtiar has both made out a prima facie case for discrimination and produced evidence to rebut Infineon's proffered lawful reasons for his termination. See Abramian, 432 Mass. at 116-117. Furthermore, as this is a case where "mixed motives" may have played a role in the reduction-in-force panel's decision to terminate Balchtiar, the burden of persuasion remains with Infineon to demonstrate "that its legitimate reason, standing alone, would have induced it to make the same decision." Haddad, 455 Mass. at 112-113.
C. Retaliation in violation of G.L. c. 151B, § 1 
            For similar reasons to those discussed above, defendants' request for dismissal of Bakhtiar's claim of retaliation must be denied.
            To make out a prima facie case for retaliation, an employee must show that he engaged in protected conduct, that he suffered some adverse action, and that a causal connection existed between the protected conduct and the adverse action. Mole, 442 Mass. at 591-592.
While defendants challenge whether Bakhtiar's meetings with his human resources representative, Briscoe, constituted "formal" complaints of discrimination, it is undisputed that Bakhtiar made the company aware of his concerns about disparate treatment as early as June 2015, and discrimination by Richardson no later than September 30, 2015.
            There is no material dispute that Bakhtiar's reporting to his human resources department qualifies as protected activity or that his termination constitutes an adverse employment action. The only remaining issue is causation.
            "[I]f adverse action is taken against a satisfactorily performing employee in the immediate aftermath of the employer's becoming aware of the employee's protected activity, an inference of causation is permissible." Mole, 442 Mass. at 592.
                                                            -12-
            Here, after Bakhtiar complained to the human resources department about being treated differently than other employees, and being discriminated against by his supervisor, that same allegedly biased supervisor was permitted by the employer to sit on a panel eight months later that determined which employees would be laid off as part of a reduction in force.
            Applying the standard of Mole, two critical factual disputes exist. First, the parties have both produced evidence on whether Bakhtiar was "a satisfactorily performing employee." Second, where Richardson apparently lacked the independent authority to terminate Bakhtiar (he previously told his superior he wanted Bakhtiar "gone," but Bakhtiar continued his employment for months thereafter), the reduction in force can be argued to be the first opportunity for retaliation by Richardson after learning of Bakhtiar's complaints to human resources. In addition, the participation of a biased panel member raises a fact question concerning the biased member's influence on the panel's final action. See Mole, 442 Mass. at 599.
            Bakhtiar's complaint of discrimination had been made known to the defendant supervisor but apparently not to the other members of the panel, who sat on the panel with the plaintiffs allegedly biased immediate supervisor. When a panel makes an employment decision, in which the allegedly biased and retaliating supervisor is part of that panel, without the panel's knowledge of the charge of discrimination against the supervisor, a question arises concerning whether that supervisor's influence may have tainted the independent decision-making of the remaining panelists. See id.
            Further, the existing case law does not reveal any Massachusetts appellate cases directly on point as to the effect of an adverse action taken at the first available reduction in force in retaliation for protected activity. The Appeals Court has stated that "[a] substantial interim between the protected conduct and the alleged retaliation can stretch the inference of a causal
                                                            -13-
connection to the breaking point." Poon v. Mass. Inst. Of Tech., 74 Mass. App. Ct. 185, 200 (2009). "[A]s elapsed time between those two events becomes greater, the inference weakens and eventually collapses." Mole, 442 Mass. at 595. See Templeton v. Mansfield Public Schools, 88 Mass. App. Ct. 1112, *12 (2015) (Rule 1:28 decision) (Given twenty-month span between protected conduct and adverse action, plaintiff could not establish causation); Haraden v. Verizon New England, Inc., 30 Mass. L. Rep. 187, *19 (June 5, 2012) (Wilkins, J.) (There was a "genuine issue of material fact" whether employer's business reason for discharging employee as part of a reduction in force resulted, in part, from retaliatory evaluation by supervisor for employee's medical leave taken twelve months earlier). However, those cases do not deal directly with a potentially biased supervisor who then participates in the reduction in force decision-making.
            While the eight-month timespan between Bakhtiar's complaints and the adverse action may "weaken" the causal inference here, it does not break it as a matter of law. The unique circumstances of this case present a question of fact whether the retaliation took place at the first available opportunity and was improperly influenced by Bakhtiar's supervisor's allegedly biased reviews and input. See Mole, 442 Mass. at 595; Haraden, 30 Mass. L. Rep. 187, *19. This may be a case of first impression and deserves the development of a full record at trial. Bakhtiar has sufficient evidence from which a fact-finder might conclude that the decision to lay him off was the result of discriminatory animus and/or retaliation, wrapped into the first available reduction in force so that it would appear to be neutral on its face.
            After hearing and review, through a combination of deposition testimony and affidavits, Bakhtiar has sustained his burden at the summary judgment stage. There are material issues of fact in dispute concerning Bakhtiar's job performance and the motives that influenced his
                                                            -14-
selection for termination as part of the reduction in force that apply to his claims for unlawful discrimination and retaliation.
ORDER
            Accordingly, for the reasons stated above, the defendants' motion for summary judgment is DENIED.
@/s/Valerie Yarashus Justice of Superior Court
@May, 29 2019
                                                            -15-
xxz