Cratsley, J.
Plaintiff, Bilal Said (“Said”) complains that defendants The Pioneer Group, Inc. and Pioneering Management Corporation (collectively “Pioneer” or “defendants”) unlawfully discriminated against him in that his termination from the company was based of race, color, national origin and/or age, in violation of G.L.c. 151B, 4. Pursuant to Mass.R.Civ.P. 56, Pioneer now asks this Court to enter summary judgment on its behalf. For the following reasons, Pioneer’s motion is DENIED.
BACKGROUND
The following relevant facts were taken from the summary judgment record, including the defendant’s and plaintiffs Rule 9A(b) statement of undisputed facts and the deposition testimony. As is required by the summary judgment standard, this Court must view the following material facts in the light most favorable to the plaintiff. Said was an employee for Pioneer, a company which engages in financial services business both in the United States and abroad.
Said began his employ on January 14, 1991 as a securities analyst (“analyst”)[2] and remained as such until his termination on or about July 24, 1998. From 1986 through the fall of 1998, Mr. David Tripple (“Tripple”) served as Chief Investment Officer at Pioneer. Tripple was Said’s supervisor from January 1991 until November 1997. In 1997, Theresa Hamacher was hired asa Head of Domestic Equities. The Portfolio Managers and Analysts reported to her and she, in turn, reported to Tripple. In 1997, three Portfolio Managers: Frank Boggan (“Boggan”), John Carey (“Carey”) and Bill Field (“Field”) completed performance evaluations of Said.
*368 As an analyst within the U.S. Equity Group, Said’s duties included reviewing the stock performance of companies within industries assigned to him by Pioneer. In addition, Said managed the Gold Fund (“the Fund”) from mid-1995 through 1997 which involved studying the industry, trading stocks, public relations, and marketing duties. In essence, Said performed virtually all of the duties a Portfolio Manager would perform even though his official title remained “Senior Analyst.” Every December, between 1991 and 1996, Tripple gave Said (and every other analyst) an oral performance review. In general, Tripple advised Said that his performance was good.[3] Said frequently expressed an interest in “running money” to Tripple at his performance reviews. Tripple assured Said that he was on the right track. In 1997, Said received his largest bonus during his employ at Pioneer. .
The Gold Fund
In 1990, Pioneer created the Gold Fund (“the Fund") which concentrated in gold and other minerals. Tripple was the Portfolio Manager of the Fund from 1991 through approximately December 1997, but in name only. Said performed the day-to-day management of the Fund. Said’s running of the Fund occurred in the following manner. One of the various analysts who worked on the fund was John Madden (“Madden”) who was responsible for metals and metal-related stocks. In June 1995, when Madden left Pioneer, Tripple asked Said to work as an analyst on the Gold Fund. In the wake of continued requests, Tripple finally let Said manage money and told Said he could run the day-to-day trading responsibilities on the Fund. Said was responsible for incremental trading among stocks already in the fund portfolio and handling shareholder redemptions.
Even though the Fund was performing at the top of the Lipper charts during the time Said ran it, Pioneer hired Michael Bradshaw (“Bradshaw”) in the summer of 1997. Bradshaw is a younger and Caucasian male who assumed responsibility for the day-to-day management of the Fund. While Bradshaw had six years of experience working in the Canadian gold industry, he had no experience managing money before Pioneer hired him. Bradshaw replaced Said on the Fund as its Portfolio Manager. In 1998, Pioneer decided that the Fund would not be profitable so it liquidated the fund.
In November 1997, Pioneer hired Theresa Hamacher (“Hamacher”) to head the U.S. Equity Group. Hamacher’s responsibilities included supervising Analysts and Portfolio Managers within the group. In August 1998, Tripple was promoted to President of Pioneer Investment Management, Inc. (formerly known as Pioneering Management Corporation). As a result of the promotion, Hamacher assumed Tripple’s former title and responsibilities as Chief Investment Officer of Pioneer Investment Management.
Said’s Written Performance Reviews in December 1997
In 1997, for the first time during Said’s employment at Pioneer, the company conducted written performance reviews of its Analysts. Three Portfolio Managers, Boggan, Field and Carey completed written evaluations of Said’s performance for the period January 1997 through November 1997. Said’s Qualitative Performance is as follows: Said received seven (7) “meets expectations” and eight (8) “exceeds expectations” from Boggan, Field and Carey, including overall performance ratings of “meets expectations” from Boggan and Field and “exceeds expectations” from Carey.
Hamacher was responsible for coordinating the written performance evaluations completed by the Portfolio Managers for Analysts at year-end 1997. In December 1997, Hamacher provided Said with written performance evaluations completed by Boggan, Field and Carey. Hamacher also provided Said with a Performance Appraisal Summary which she completed. Boggan, Field and Carey made complimentary statements regarding Said’s performance, including comments that Said was intelligent, insightful, diligent and that the quality of his work was prodigious. Each of the other Analysts in the U.S. Equity Group received written performance evaluations in December 1997 for the period January 1997 through November 1997. Despite overall positive ratings, Tom Crowley (“Crowley”) and Robert Junkin (“Junkin”) received negative comments and criticisms on their reviews from Hamacher. Nevertheless, Crowley and Junkin are still employed by Pioneer. Crowley has been promoted to Portfolio Manager.
The Computer Tracking System for Analyst Stock Recommendations
Hamacher explained to all Analysts that they must use the computerized system to keep track of their work product, including their stock recommendations. However, Said’s Portfolio Managers preferred that Said, as well as other Analysts, speak to them regarding their recommendations rather than being forced to rely on a computerized system. In late 1997 or early 1998, Hamacher sent a memorandum to the Analysts, including Said, instructing them on how to use of the computerized stock recommendation tracking system and on the forms to be used. In March of 1998, Hamacher drafted a memorandum concerning the Analyst Bonus Plan which advised Said that 50% of his bonus would be based on an evaluation of his contribution to the performance of Pioneer’s investments. This would be based on the quantitative results of his stock recommendation as measured by the computerized tracking system.
Prior to conducting a quarterly review with Said in April 1998, Hamacher sent a memorandum of topics to consider for discussion at the quarterly review. Included in the list of topics was the request that Said *369 look at his stock recommendation list and assess, among other matters, the number of new ideas he added and, of those new ideas (1) how many were his own ideas (as opposed to coming from Portfolio Managers), (2) how many generated a portfolio action, and (3) how many had a significant portfolio impact. Said orally agreed to comply with Hamacher’s request concerning the recording of recommendations on the tracking system. He did not, however, add any new recommendations to the tracking system prior to the April 1998 review. Said believed that the Portfolio Managers preferred that he speak to them about his stock recommendations and recording the recommendations on the tracking system was a low priority. Based on this understanding, Said did not add new recommendations to the tracking system prior to April 1998 review.
Said’s Quarterly Performance Review in April 1998
None of the Portfolio Managers to whom Said reported and who prepared his 1997 year-end reviews testified to any change in performance for 1998. They did not voice any complaints to management about his performance in 1998. Specifically, Carey felt so strongly about Said’s superior performance that, when Hamacher told him that she was terminating Said, Carey suggested to her that Said remain at Pioneer and work on his funds. On April 13, 1998, Hamacher had a meeting with Said to review his performance during the first quarter of 1998. Hamacher told Said that his productivity needed to be higher which Said considered to be a criticism, but he did not sense that she was dissatisfied with this aspect of his performance or that she felt he needed to improve it.[4] Hamacher suggested that Said come up with three or four new ideas, but did not require a particular time frame in which to develop these ideas nor what form the ideas had to take. Hamacher did not use specific words to convey any warning to Said regarding his job performance.
Said’s Performance After April 1998 and the Decision to Terminate His Employment
Subsequent to the meeting on April 13, 1998, Said made several efforts to develop knowledge of new industries. Specifically, Said met with America On Line (“AOL”) in Washington D.C. to develop knowledge of the internet industry. Said also led a discussion regarding the Internet at a meeting of the U.S. Equity Group. In June 1998, the group had an Internet Industry Analysts meeting, after which there was a period of discussion regarding which stocks to write up. At the request of Carey, Said also wrote two reports on two stocks in the media industry: A.H. Belo and Hearst-Argyle. While those two recommendations were the only ones mechanically entered into the system, Said constantly pursued new ideas and discussed them with the Portfolio Managers. Said’s productivity after the April 1998 meeting with Hamacher included studying new industries, writing reports for his Portfolio Managers, and discussing new ideas with them. Thus, he responded with Hamacher’s suggestions with regard to his performance. On or about July 16, 1998, Hamacher met with Said and advised him that because his productivity remained below her expectations, she was terminating his employment with Pioneer.
Procedural Background
Pursuant to G.L.c. 15IB, 9, a timely complaint must be filed with the MCAD within six months of the allegedly discriminatory act.[5] On or about November 2, 1998, Said filed a charge of discrimination with the Massachusetts Commission Against Discrimination (“MCAD”) alleging that his employment was terminated because of his age, race, color, creed and or national origin in violation of G.L.c. 151B. With his filing, Said requested that MCAD dismiss the Charge pursuant to 804 C.M.R. 1.13(2)(a) without prejudice so that he could file his 'claim in the Superior Court. On December 4, 1998, MCAD dismissed Said’s charge without prejudice. Said filed his complaint in the Superior Court on May 17, 1999. On July 2, 2001, Pioneer moved for summary judgment and oral argument was heard from both parties on that motion on August 13, 2001.
DISCUSSION
I. Summary Judgment Standard
Summary judgment shall be granted where there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. See Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Mass.R.Civ.P. 56(c). In ruling on a motion for summary judgment, “a judge . . . must consider ‘the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,’ in determining whether summary judgment is appropriate.” Flesner v. Technical Communications Corp., 410 Mass. 805, 808 (1991), quoting Mass.R.Civ.P. 56(c) (other citations omitted). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, and that the summary judgment record entitles the moving party to judgment as a matter of law. See Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The moving party may satisfy this burden either by submitting affirmative evidence that negates an essential element of the opposing party’s case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. See Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). Courts must read the summary judgment material in a light most favorable to the non-moving party. See Blare v. Husky Injection Molding Systems Boston Inc., 419 Mass. 437, 438 (1995). Because the ultimate question is the employer’s state of mind, however, requiring a finding dependent on circumstantial evidence is usually dis *370 favored. Id. at 439. The opposing party cannot rest on his or her pleadings and mere assertions of disputed facts to defeat the motion for summary judgment. See LaLonde v. Eisner, 405 Mass. 207, 209 (1989).
Summary judgment is a disfavored remedy in the context of discrimination cases based on disparate treatment. Brunner v. Stone & Webster Eng’g Corp., 413 Mass. 698, 705 (1992) (“where motive, intent, or other state of mind questions are at issue, summary judgment is often inappropriate”), quoting Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991), because the ultimate issue of discriminatory intent is a factual question, Anderson v. Bessemer City, 470 U.S. 564, 572-73 (1985). The ultimate question of the defendants’ state of mind is elusive and rarely established by other than circumstantial evidence. See Wheelock College v. Massachusetts Comm’n Against Discrimination, 371 Mass. 130, 137 (1976).
II. Age & Race Discrimination Standard: Chapter 15IB, 4
Pursuant to G.L.c. 151B, 4(1B) it is unlawful for an employer to discriminate on the basis of age. The statute provides, in relevant part, that
It shall be an unlawful practice ... for an employer in the private sector, by himself or his agent, because of the age of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual, or to discriminate against such individual in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification.
G.L.c. 151B, 4(1B). It is also unlawful for an employer to discriminate on the basis of race and or national origin.
for an employer in the private sector, by himself or his agent, because of the race, color, religious creed, national origin, sex, sexual orientation, ... or ancestry of an individual to refuse to hire or employ or to bar or to discharge from employment such individual in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification.
G.L.c. 151B, 4(1). The three stage analysis by which Massachusetts courts analyze a plaintiffs burden in establishing its prima facie case[6] of discrimination is as follows.
At the first stage of the analysis, the plaintiff must establish, by a preponderance of the evidence, that he or she was (i) over forty; (ii) doing his job acceptably; (iii) fired; and (iv) replaced by a younger person. Tardanico. v. Aetna Life &Cas. Co., 41 Mass.App.Ct. 443, 447 n.4 (1996). Similarly, to establish a prima facie case of race discrimination under c. 151B, the plaintiff must show that he was: (1) a member of a racial minority; (2) doing his job acceptably; (3) terminated; and (4) replaced with a similarly qualified individual. Zhang v. Massachusetts Inst. of Tech., 46 Mass.App.Ct. 597, 604 (1999).
At the second stage of the analysis, the employer can rebut the presumption created by the initial stage of the plaintiffs prima facie case by articulating a legitimate, nondiscriminatory reason for its employment decision. Wheelock College v. Massachusetts Comm'n Against Discrimination, 371 Mass. 130, 136 (1976), quoting McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).
The third stage is triggered once, and if, the defendant articulates such a legitimate nondiscriminatory reason, the plaintiff must prove that the employer’s justification for the action against him is not genuine, but a rather pretext for the real and unlawful motive. For explanations of this three-stage approach, see McDonell Douglas Corp v. Green, supra at Id.; Wheelock College v. Massachusetts Comm’n Against Discrimination, supra at 138-39 (1976); Brunner v. Stone & Webster Engr. Corp., supra at 700 (1992); Johansen v. NCR Comten, Inc., 30 Mass.App.Ct. 294 at 296-97; Blare v. Husky Injection Molding Systems Boston, Inc., supra at 440-43 (1995). Otherwise stated, “Once the defendant has articulated a nondiscriminatory reason for terminating the plaintiff, the plaintiff must produce evidence that could enable a reasonable juiy to conclude that the defendant’s articulated reason is a mere pretext and that the actual cause of the termination is discrimination.” Bloomfield v. Bernardi Automall Trust et al., No. 99-12260 at 9 (D.Mass. Aug. 2001), taken from Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 141 (2000). Considering that Massachusetts is a pretext only jurisdiction, if successful in stage three, “the plaintiff is entitled to recovery for illegal discrimination under G.L.c. 151B.” See Powers v. H.B. Smith Co., Inc., 42 Mass.App.Ct. 657, 661 (1997), quoting Blare v. Husky Injection Molding Sys. Boston, Inc., supra at 444-45 (1995).
The Supreme Judicial Court (SJC) has recently clarified the third stage of the analysis. The decision in Lipchitz v. Raytheon, 434 Mass. 493 (2001), is instructive as to the sufficiency of evidence “to support a finding of pretext at the third stage of the now-familiar order of proof [required in order to analyze G.L. 151B, 4 lawsuits] originally set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and adopted by us in Wheelock College v. Massachusetts Comm’n Against Discrimination, 371 Mass. 130 (1976).” Lipchitz v. Raytheon, supra at 498. The SJC in Lipchitz held that when the plaintiff presents sufficient evidence from which a reasonable jury could find that at least one of the employer’s reasons for taking action against the plaintiff employee was false, it properly can infer that the employer’s actions were based on unlawful discrimination. Lipchitz v. Raytheon supra at Id., see also Abramian v. President & Fellows of Harvard College, 432 Mass. 107, 118 (2000). The U.S. District Court for Massachusetts explains the Lipchitz ratio *371 nale in the summary judgment context: “(A) finding that the employer’s purported explanation is mere pretext may support an inference that the employer unlawfully discriminated . . . evidence that the employer is not telling its true reasons for its actions may be sufficient to survive summary judgment.” Bloomfield v. Bernardi Automall Trust et al., supra at 9, explaining Abramian v. President & Fellows of Harvard College, 432 Mass. 107, 118 (2000). In Lipchitz, the SJC held that a plaintiffs discrimination claim may survive summary judgment if he or she has produced evidence that at least one of the reasons the employer proffers for its employment decision is false. Lipchitz v. Raytheon, supra at 507.
The Court in Bloomfield interprets the Lipchitz decision as follows; “. . . despite some misgivings concerning whether the Lipchitz language with its emphasis on ”at least one" false reason fairly states the principles of federal law, it is plainly the last word on Massachusetts law and represents the minimum standard plaintiff must meet for his discrimination claims to survive." Bloomfield v. Automall Trust and others, supra at 11 n.4 (2001).
III. Said’s Age and Racial Discrimination Claims
Viewing the facts in the light most favorable to the plaintiff, there are sufficient disputed issues of material fact to warrant this Court’s denial of Pioneer’s motion for summary judgment. First, the undisputed facts reveal that plaintiff has established the prima facie elements necessary at the first stage of the employment discrimination analysis. It is conceded that Said (1) was a member of the protected class (in that he was over the age of forty and that he was from Pakistan), (2) performed his job at an acceptable level; and (3) was terminated. The satisfaction of the fourth prong is contested.
While defendants contend that it did not seek to fill Said’s position with a similarly qualified or less qualified younger and Caucasian person (and subsequently retained such a person outside the protected class of age and race), there is a genuine issue of material fact concerning whether a similarly qualified individual was employed in Said’s place. The District Court has explained the relevant test:
The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated. Exact correlation is neither likely nor necessary, but the cases must be fair congeners.
Molloy v. Blanchard, 115 F.3d 86, 91 (1st Cir. 1997). Even though Said had been an excellent “de facto” manager of the Gold Fund, Pioneer retained a new Portfolio Manager in the summer of 1997, a younger Caucasian who was Canadian named Bradshaw who had no prior experience in managing money. While Bradshaw did not have the same education in financial matters, he was hired to perform the same functions as Said had performed as “de facto” manager of the Fund. Therefore, there remains a genuine issue of material fact as to whether Bradshaw was a similarly qualified individual who replaced Said.
Second, for purposes of this memorandum and order denying the defendant’s motion for summary judgment, Said has conceded that the defendant lias met its burden of articulating a non-discriminatory reason for Said’s termination; specifically that he was not sufficiently productive.
Thus, only the third stage of analysis remains for this Court to address in determining that a genuine issue of material fact exists as to Said’s age and racial discrimination claims. The plaintiff has raised a genuine issue of fact with regard to the truthfulness of the defendant’s proffered reason for termination and, thus, the defendant is not entitled to judgment as a matter of law. Abramian v. President & Fellows of Harvard College, supra at 118.
The SJC has held that a claim may survive summary judgment solely because evidence has been produced that the employer has given a false reason for its actions. A reasonable person may fairly infer that the employer would give a false reason to conceal the impermissible and discriminatory actual reason. See Bloomfield v. Bernardi Automall Trust et al., supra at 9-10; Abramian v. President & Fellows of Harvard College, supra at id. (quoting Blare v. Husky Injection Molding Sys. Boston, Inc., supra at 446 (1995)); Furnco Construction Corp. v. Waters, 438 U.S. 567, 577 (1977).
A reasonable person could infer that Pioneer’s reason for terminating Said was false, i.e. that Said was not sufficiently productive, given Said’s superior performance record throughout his career at Pioneer. From 1991 through 1996, Tripple gave Said consistently positive annual performance reviews. In the summer of 1995, Tripple asked Said to begin running the Gold Fund which involved taking on increased responsibility in addition to Said’s duties as an Analyst. Said received salary increases and bonuses every year except for 1994 when he was told that the company was having a bad year and there were no increases in salary. In 1997, Said was given extremely positive performance reviews by his three supervisors (Boggan, Carey and Field) and received the largest salary increases/bonuses he had ever received. Furthermore, Said was veiy productive during the first months of 1998 prior to his termination. All three of his supervisors testified to Said’s superior performance in 1998. Thus, Hamacher’s claim that Said was unproductive could be construed as a false reason offered to conceal discriminatory motivations for terminating Said.
In establishing whether Said has produced sufficient evidence that a reasonable jury could conclude that unsatisfactory performance or low productivity *372 was not the actual reason for termination, it is not imperative that the plaintiff present evidence to show that every single reason that defendant employer proffers for taking action against the plaintiff employee is false. The District Court of Massachusetts has recently clarified this point by analyzing the Supreme Judicial Court’s ruling in Lipchitz v. Raytheon, supra at 493 (2001). In that case the SJC held that a denial of a motion for directed verdict was proper when ”[t]he plaintiff presented sufficient evidence from which a reasonable jury could find that at least one of [the defendant’s] reasons was false and from this it properly could have inferred that [the employee] was not promoted because of unlawful discrimination.” Lipchitz v. Raytheon, supra at 498. The District court explains “that the implication of th[e] language [in Lipchitz] is that if numerous reasons are given for a termination, a claim ought to survive summary judgment if there is evidence that one of them is untrue even if no evidence can be produced to support an inference that the others are false.” Bloomfield v. Automall Trust and Others, supra at 10. Thus, the practical implication of this clarification is that the plaintiff need not prove that every reason put forth by the defendant is untrue to survive the summary judgment threshold.
Finally, there is added evidence of a genuine issue of material fact resulting from Pioneer’s practices in giving promotions and retaining white male employees despite their poor performance. While Said has withdrawn his claims for failure-to-promote, evidence surrounding Pioneer’s refusal to promote Said can be introduced to support his general discrimination claims. See Keeler v. Putnam Fiduciary Trust Co., 238 F.3d 5 (1st Cir. 2001); Sabree v. United Bhd. of Carpenters & Joiners Local No. 33, 921 F.2d 396, 400 n.9 (1st Cir. 1990) (plaintiff alleging employment discrimination may use earlier events of discrimination as background evidence even where he cannot recover for them).
From the commencement of his employment at Pioneer, Said made it clear to Tripple that he was interested in becoming a Portfolio Manager. Despite assurances that he was on track to become a Portfolio Manager and his strong performance over the years, he was not promoted. While he was employed at Pioneer, many of his younger Caucasian colleagues were promoted to Associate Portfolio Manager and Portfolio Manager. While his colleagues’ skills were comparable to those of Said in education, experience and skill level, Said did not receive promotions. Specifically, Hamacher’s April 1998 notes assessing Bob Stimson’s productivity criticized him (e.g. that he was disruptive, needed to generate a greater range of ideas and that he did not meet expectations on communication effectiveness). Stimson was not terminated. Instead, he was given much more time than Said was given to improve his job performance. In addition, in Hamacher’s estimation, Scott Zilora needed to significantly improve productivity and performance. He was given time to improve his performance and is stillemployed at Pioneer. Finally, Michael Bradshaw (the Caucasian who had replaced Said in his job managing the Gold Fund[7]) received criticism from Hamacher at his 1998 year-end review. She explained that he made only a few specific recommendations and had not been that involved with other portfolios. She was also disappointed with his lack of impact as an Analyst in matters not regarding gold stocks. Nevertheless, he was not terminated and is still employed at Pioneer.
Given that many of the Portfolio Managers and Associate Portfolio Managers at Pioneer were Analysts with similar educational backgrounds and levels of experience as Said and were promoted, genuine issues of material fact remain regarding Pioneer’s tolerance of poor performance from some younger and Caucasian analysts who still remain employees at Pioneer. Consequently, there exists sufficient information in the summary judgment record to preclude Pioneer’s motion for summary judgment on the plaintiff s claims of race and age discrimination.
ORDER
For the foregoing reasons, it is hereby ORDERED that defendant’s motion for summary judgment on the plaintiffs claims of age and race discrimination is DENIED.

 Specifically, Said was a Senior Analyst within the U.S. Equity Group of Pioneer’s investment management operation

 In 1994, Said did not receive a raise and his bonus was less than it had been because (1) Said spent time with his family in Pakistan following his father’s death that year and (2) Tripple informed Said that Pioneer was having a bad year that year.

 Hamacher’s April 1998 notes assessed other Analyst’s productivity as well. Specifically, she criticized Bob Stimson’s productivity (e.g. that he was disruptive, needed to generate a greater range of ideas and that he did not meet expectations on communication effectiveness). Stimson was not terminated, however. Instead, he was given much more time than Said was given to improve his job performance. In addition, in Hamacher’s estimation, another analyst, Scott Zilora, needed to significantly improve productivity and performance. He was given time to improve his performance and is still employed at Pioneer.

 Said was terminated on July 16, 1998.

 This Court’s analysis and description of the three-stage analysis used to determine whether plaintiff has made a prima facie case of employment discrimination is applicable to both his age and racial discrimination claims.

 Although Said was never the official Portfolio Manager of the Gold Fund, he was, for all practical purposes, managing the fund.