Leibensperger, Edward P., J.
Introduction
Northern Bank and Trust Company (“Northern Bank” or “the bank”) moves for summary judgment dismissing the gender discrimination and sexual harassment claims of Kerri Pigott. Pigott alleges that Northern Bank discriminated against her based on her gender when the bank terminated her employment and assigned her duties to a male employee. Pigott’s sexual harassment claim is based on four comments about her physical appearance made by Northern Bank’s president. Northern Bank responds that it terminated Pigott’s employment because the economic recession required a reduction in expenses including the elimination of Pigott’s position. In addition, Northern Bank asserts that Pigott had performance deficiencies that justified her discharge. As a result, the bank contends that it had legitimate nondiscriminatory reasons for terminating her employment. With respect to the sexual harassment claim, the bank states that the alleged comments, assuming they were actually made in the context alleged, are not in the nature of sexual harassment. For the reasons set forth as follows, the bank’s motion is allowed in part and denied in part.
Background
On December 15, 2004, Northern Bank hired Pigott as the Vice President of Retail Development. Pigott was hired for a new position created to complement the bank’s investment services. Pigott’s annual compensation as of the date of her hire was $97,000. She received raises in every year of her employment at Northern Bank. There is no evidence that she was ever disciplined or severely criticized regarding her work performance. Northern Bank hired Pigott as an at-will employee who could be terminated from employment with or without cause and with or without any notice.
Pigott’s job responsibilities consisted of overseeing the retail delivery of Northern Bank’s services including branch sales, employee development, branch renovations and overall operations. Pigott was responsible for all marketing and branding initiatives. Northern Bank hired Pigott as part of a transition towards a sales culture focused on marketing and branding. The bank increased its marketing budget from $60,000 to $350,000 per year in connection with the hiring of Pigott.
During the discussions concerning her hiring, Pigott requested the title of Senior Vice President. She previously had been a senior vice president at another bank. She was told by Northern Bank that the bylaws of the bank did not provide for a senior vice president position and, therefore, she could not have the title. Pigott then accepted employment as a vice president.
According to Northern Bank, its senior management consisted of James Mawn, Sr., James Mawn, Jr., Donald Queenin, Frank Kenney, Dawn Ferrari and Pigott. According to the bank’s organizational chart in 2009, the positions and titles were as follows:
Mawn, Sr.: President
Mawn, Jr.: Executive Vice President
Queenin: Executive Vice President
Kenney: CFO/Treasurer
Ferrari: Vice President/Human Resources
Pigott: Vice President/Retail Development
Pigott contends that senior management consisted only of Mawn Sr., Mawn Jr., Keeney and Queenin. There is evidence in the record to support that contention, including the deposition testimony of Dawn Ferrari.
The bank had a total of nine vice presidents; four of them were female. Throughout Pigott’s employment, Northern Bank employed more females than males. A workforce analysis performed by an outside consultant *532 reported that as of October 1, 2008, the bank employed eighty-four females, or 66.7% of the workforce, and forty-two males, or 33.3% of the workforce. As of February 2010, eight of Northern Bank’s eleven branches were managed by females. Pigott contends, however, that the women were, for the most part, in lower level positions at the bank and that “senior management” was all male. Pigott claims that all significant decisions had to be approved by the all-male senior management.
In the almost five years of Pigott’s employment at the bank she never received a written performance review. In contrast, a male vice president, Darren Sawicki, Vice President of Operations, testified that he received a written performance review every year until 2010. When Pigott was terminated, it was Sawicki who took over Pigott’s previous duties. Prior to the termination of Pigott, the bank held “Efficiency Meetings” on a weekly basis. The meetings were attended by senior management and concerned ways the bank could save money. The retail area for which Pigott was responsible was a large percentage of the bank’s operations. Nevertheless, Pigott was not included in the Efficiency Meetings, but Sawicki was included.
Sometime after Pigott was hired, Northern Bank hired a male, Jay DiOrio, as a loan officer. He was given the title Senior Vice President by Mawn, Jr. that was denied to Pigott. The bylaws do not provide for that position but Mawn, Jr. felt the need to offer the title in order to bring DiOrio on board.
On October 22, 2009, Mawn, Jr. and Ferrari met with Pigott and informed her that the bank was terminating her employment effective immediately. According to Mawn, Jr., the termination followed discussions with Mawn, Sr. about expenses at the bank during the economic downturn. In the summer of2009, Northern Bank terminated the employment of a male vice president/loan officer. A few days prior to October 22, 2009, the decision was made to terminate Pigott. Mawn, Jr. told Pigott that her termination was a strategic decision because the direction of the bank was changing. No suggestions of poor work performance were made at the time. A termination letter and separation agreement were presented to Pigott. Neither document made any reference to performance issues concerning Pigott. The separation agreement offered twelve weeks of severance payments in exchange for a release. Pigott did not accept the release or sign the separation agreement.
After the termination, Pigott’s job responsibilities were assigned to Sawicki. No other changes were made in the bank as a result of the alleged strategic change. The bank contends that the termination of employment of the loan officer the previous summer was part of the change in strategic direction. Pigott disputes that contention.
When Ferrari received from the bank’s unemployment insurer the form to fill out concerning Pigott’s termination, she went to Mawn, Jr. She asked “what do you want me to select in terms of a reason for [Pigott’s] departure?” Mawn, Jr. instructed her to select “deliberate misconduct and violation of company policies.” Prior to that moment, Ferrari, the Vice President of Human Resources, had had no discussions with Mawn, Jr. or any other senior managers about deliberate misconduct by Pigott.
With respect to Pigott’s claim of sexual harassment, the evidence in the record is as follows. Pigott identifies four occasions where she allegedly heard comments from Mawn, Sr.[1] On the first occasion, Mawn, Sr. said “Hey, good looking” to Pigott as she was walking down the hall. The second incident also occurred when she was walking down the hall of the executive suite at the bank. Mawn, Sr. said “Good looking dress for a good looking woman.” In September 2008, Mawn, Sr. was following Pigott walking towards a conference room. He remarked to Mawn, Jr., "Jim, you have a good looking woman following you.” The next day, Mawn, Sr. allegedly commented again as he followed Pigott saying “Nice looking dress.” Pigott ignored these comments at the time. She did not report the comments to the Vice President for Human Resources. The record does not contain Mawn, Sr.’s version of these events because sometime after Pigott was terminated from employment, Mawn, Sr. died.
On December 22, 2009, Pigott filed a complaint with the Massachusetts Commission Against Discrimination alleging she was discriminated against based on her gender and that she was sexually harassed in violation of G.L.c. 151B, §4(1), (16A). On September 15, 2010, Pigott filed a private right of action in this court.
Discussion
1. Standard for Review
Summary judgment may be granted where there exists no genuine issue of material fact and where the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Cassesso v. Commonwealth, 390 Mass. 419, 422 (1983); Community National Bank v. Dawes, 369 Mass. 550, 553 (1976). The moving party bears the burden of demonstrating affirmatively the absence of a triable issue and that the summary judgment record entitles it to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The moving party may satisfy this burden either by submitting affirmative evidence that negates an essential element of the opposing party’s case, or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of its case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors, 410 Mass. 706, 716 (1991). Any doubt as to the ability of the moving party to satisfy its burden on a motion for summary judgment must be resolved in favor of the non-moving party. Kaitz v. Foreign Motors, Inc., 25 Mass.App.Ct. 198, 202 (1987).
The court uses a three-step burden-shifting scheme to analyze discrimination claims based on disparate treatment and subject to being proved by circumstan *533 tial evidence. Wheelock College v. Massachusetts Comm’n Against Discrimination, 371 Mass. 130, 136 (1976), citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). First, the plaintiff employee bears the burden to state a prima facie case for gender discrimination. To establish a prima facie case the employee must show that (1) she is a member of a protected group; (2) she performed her job at an acceptable level; (3) she was terminated; and (4) her employer sought a replacement with similar qualifications. Beal v. Bd. of Selectmen, 419 Mass. 535, 544 (1995). In the case of a reduction in force, in which the employer permanently eliminates the employee’s position, the employee establishes the fourth element by producing some evidence that her layoff occurred in circumstances that would raise a reasonable inference of unlawful discrimination. Sullivan v. Liberty Mutual Ins. Co., 444 Mass. 34, 45 (2005). The burden of showing a prima facie case is not onerous. Id.
The burden then shifts to the defendant employer to “articulate some legitimate, nondiscriminatoiy reason” for the alleged discriminatoiy actions. Wheelock College, 371 Mass. at 136. Upon such a showing, the burden shifts back to the employee to prove that the employer’s reasons for the adverse employment action are not true, but rather a pretext for unlawful gender discrimination. Abramian v. President & Fellows of Harvard, 432 Mass. 107, 117 (2000). To establish that the employer’s stated reasons for terminating the employee were a pretext for discrimination, the female employee must identify and relate specific instances where a similarly situated male employee was treated differently. Matthews v. Ocean Spray Cranberries, Inc., 426 Mass. 122, 129 (1997). If such evidence exists, the ultimate question of defendant’s motivation for terminating the employment of the plaintiff is a fact issue that should be left to the juiy.
2. Prima Facie Case
The first and third elements of Pigott’s prima facie case are uncontested, she is a female and Northern Bank terminated her employment on October 22, 2009. The second element, performance of her job at an acceptable level, is also satisfied. Pigott received regular raises in salaiy. She received no written performance evaluations criticizing her work. She was not informed of any performance deficiency as a basis for her termination.
The fourth prong of the prima facie test is that there be some evidence that Pigott’s termination occurred in circumstances that would raise a reasonable inference of unlawful discrimination. Where the “reduction in force” is quite small (at most, in this case, two vice presidents) the fact that Pigott’s duties were reassigned to a male is some evidence giving rise to an inference of discrimination. Lipchitz v. Raytheon, Co., 434 Mass. 493, 498 (2001) (to determine whether an employee has the requisite experience to replace a terminated employee performance evaluations and current responsibilities may be examined). The prima facie case is supplemented by the evidence that Pigott was subject to treatment that was different from what was afforded to Sawicki. She did not receive written performance evaluations while he did. She was not included in an important, recurring committee meeting while Sawicki was included. Pigott did not receive the Senior Vice President title while a male new employee did. All of the evidence, taken together, satisfies the fourth prong of the prima facie test.
Consequently, Pigott makes out a prima facie case. Tbe burden shifts to Northern Bank to articulate a nondiscriminatoiy reason for its decision to terminate Pigott’s employment. At the time of her termination, the bank’s articulated reason was to reduce expenses and take the bank in a different strategic direction. The burden on the bank is one of production, only. It does not need to persuade the trier of fact. The bank, therefore, meets its burden by the testimony of Mawn, Jr. and Ferrari regarding the business reasons for the termination. Accordingly, the burden shifts back to Pigott to establish a triable case regarding discrimina-toiy intent based upon pretext or otherwise.
3. Pretext
Having met its burden of production by articulating lawful grounds for the termination of Pigott’s employment, the presumption arising from Pigott’s prima facie case evaporates. Pigott must offer evidence of a discriminatory motive. like most discrimination cases, however, there is no direct evidence of sex discrimination. Pigott, therefore, must point to indirect or circumstantial evidence that gives rise to a permissible inference of unlawful discriminatoiy intent. One way to do this is to adduce evidence showing that the reason given by Northern Bank for the termination was a pretext to hide a motive of discrimination. “This may be accomplished by showing that the reasons advanced by [the employer] for making the adverse decision are not true.” Abramian, 432 Mass. at 117.
Here, there is sufficient evidence of pretext to entitle Pigott to a trial. The most telling evidence is the decision by the bank to shift its stated justification for the termination. The bank’s change, at the time of responding to an unemployment insurance claim, and now in support of summary judgment, to a theory of “deliberate misconduct and violation of company policies” as a reason for termination belies its original articulated reason— economic necessity. A reasonable inference may be drawn that the economic necessity rationale was untrue because a different reason was stated to the unemployment insurer. Also, the evidence, disputed as it may be, that Pigott’s termination was the only effect of the purported new “strategic direction” and cost savings lends support to concluding that the economic necessity rationale was untrue. Finally, the second reason for termination — deliberate misconduct — may also be determined by a reasonable fact finder to be untrue. No such allegations were made to Pigott while she was employed nor were the *534 allegations articulated orally or in writing when her employment was terminated.
“Evidence that the employer’s reasons are untrue gives rise, therefore, to an inference that the plaintiff was a victim of unlawful discrimination.” Abramian, 432 Mass. at 118. Because there is sufficient evidence for a fact finder to conclude that both of Northern Bank’s articulated reasons for terminating Pigott’s employment were untrue, a genuine issue of material fact exists as to the intent and motivation of the bank. Summaiy judgment must be denied.
4. Sexual Harassment
Pigott’s claim of sexual harassment is brought pursuant to G.L.c. 151B. That statute defines the term “sexual harassment” as follows: “sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when (a) submission to or rejection of such advances, requests or conduct is made either explicitly or implicitly a term or condition of employment or as a basis for employment decisions; (b) such advances, requests or conduct have the purpose or effect of unreasonably interfering with an individual’s work performance by creating an intimidating, hostile, humiliating or sexually offensive work environment. Discrimination on the basis of sex shall include, but not be limited to, sexual harassment.” Pigott makes no allegations concerning the quid pro quo type of sexual harassment prohibited by subsection (a). Instead, she claims that the comments by Mawn, Sr. created a hostile or sexually offensive work environment, as defined in subsection (b).
Pursuant to the plain language of the statute, the alleged harassment must be “sexual” in nature. Sum-maiy judgment dismissing the claim may be granted where the particular use of language, even if hostile or offensive, cannot reasonably be deemed “sexual” under the circumstances. Prader v. Leading Edge Products, Inc., 39 Mass.App.Ct. 616, 619 (1996) (summary judgment affirmed where use of words “cocksucker” and “a fucking . ..” was not in the circumstances sexual commands or lurid innuendo); Cody v. Sutar d/b/a Copley Square Associates, 1997 WL 109563, at *3 (Superior Ct.; Lauriat, J.) [6 Mass. L. Rptr. 457] (summaiy judgment for employer where comments on appearance of plaintiff, made on numerous occasions, were not “sexual”). Accepting for purposes of this motion the entirety of Pigott’s description of the circumstances, surrounding the alleged comments of Mawn, Sr., the conduct was not “sexual” in context or nature.
In addition, a plaintiff employee must demonstrate that she worked in a sexually hostile environment that unreasonably interfered with her work performance. Muzzy v. Cahillane Motors, Inc., 434 Mass. 409, 411 (2001). The employee must establish that the conduct alleged was sufficiently severe and pervasive to interfere with a reasonable person’s work performance. The evidence of sexual harassment must be considered from “the view of a reasonable person in the plaintiff s position.” Id. at 411-12. Where, as here, only four comments were made over five years, the last of which occurred more than a year before the termination of Pigott’s termination, and where the alleged harassment was never reported to the Vice President for Human Resources, Pigott cannot establish that the alleged harassment was severe or pervasive. For these reasons, summaiy judgment is granted in favor of Northern Bank on Pigott’s claim of sexual harassment.
ORDER
For the foregoing reasons, the defendant’s Motion for Summaiy Judgment is ALLOWED with respect to the plaintiffs sexual harassment claim and DENIED with respect to the plaintiffs gender discrimination claim.

The dates of the comments are June 8, 2007 and August 25, September 15 and September 16, 2008.