Curran, Dennis J., J.
This action arises out of an employment dispute between the plaintiff Dr. Sarah Moser and the defendants University of Massachusetts at Lowell and Dr. Liana Cheney under G.L.c. 15IB, §§4(1) and (4A). Dr. Moser claims that the university discriminated against her on the basis of her gender and that Dr. Cheney interfered with her right to work in an environment free from unlawful discrimination. Dr. Moser alleges that UMass Lowell’s decision not to renew her employment contract for the 2012-2013 academic year was premised upon a gender bias against women. She claims that Dr. Cheney displayed a discriminatory animus towards her and this discrimination materially influenced UMass Lowell’s decision not to renew her contract.
Dr. Moser has also sued Dr. Cheney for defamation and intentional interference with contractual relations. Dr. Cheney brought a motion to dismiss those claims under Mass.R.Civ.P. 12(b)(1) and 12(b)(6), which was denied some time ago. The defendants have now brought a partial motion for summary judgment under Mass.R.Civ.P. 56(c), seeking to dismiss counts III and IV of the first amended complaint. For the reasons set forth below, the defendants’ motion is DENIED.
BACKGROUND
The following facts are taken from the summary judgment record and the Statements of Undisputed Material Facts filed by the parties under Superior Court Rule 9A(b)(5). These facts are recited in the light most favorable to the plaintiff, the non-moving party. Attorney Gen. v. Bailey, 386 Mass. 367, 370-71 (1982). The court reserves further facts for legal analysis.
On May 19, 2010, Provost Ahmed Abdelal extended an offer of appointment to Dr. Moser offering her a two-year tenure-track position as an assistant professor of Asian Studies and Culture within the Department of Cultural Studies at UMass Lowell. The offer made clear that this position was subject to annual renewal pursuant to the procedures outlined in the Massachusetts Society of Professors Collective Bargaining Agreement.[1] On May 30, 2010, Moser accepted the position.
In November 2010, the Cultural Studies Department Personnel Committee recommended Dr. Moser’s reappointment, stating that Dr. Moser was an effective teacher and had worked with others in the department to explore interdisciplinary projects. Dr. Moser’s student evaluations show that, during her time at UMass Lowell, she was a well-liked and effective professor. These student evaluations were better than the average evaluations of a first-year tenure-track professor in the Cultural Studies Department.
Dr. Marie Frank, an associate professor within the department, visited Dr. Moser’s class twice, once during the fall semester and again during the spring semester and prepared evaluations following each visit. Dr. Cheney, who is the Department Chair of the Cultural Studies Department, instructed Dr. Frank to do so even though the faculty contract only mandates these classroom evaluations when requested by the particular faculty member. Dr. Moser made no such request. Dr. Frank’s first classroom evaluation was positive and did not express concerns regarding Dr. Moser’s teaching abilities. Her second classroom evaluation was also positive, however she made a suggestion regarding the format of student presentations in the class.
Dr. Cheney also visited Dr. Moser’s class during the fall semester and prepared an evaluation following her visit. Although the faculty contract requires department chairs who conduct a classroom visit to prepare an evaluation within five days of the visit, Dr. Cheney did not draft her classroom evaluation until almost two months later, incorporating it into her fall evaluation. Dr. Cheney’s fall evaluation notes that Dr. Moser was an “effective and motivated teacher,” that she was engaged in active research on Indonesian cultures and was planning conferences on this subject, and noted that while her service activities were not extensive she was participating within the department as well as collaborating on projects with other departments within the University. Dr. Cheney also drafted a spring evaluation of Dr. Moser, in which she stated that Dr. Moser’s teaching lacked critical analysis and visual imagery, that her only area of research was Indonesian culture, and that her service to the department and the University was lacking. In her evaluation, Dr. Cheney also noted that the enrollment in Dr. Moser’s *223 classes was low and mischaracterized the amount of students who attended the classes she had visited during the spring semester.
Dr. Cheney and Dr. Moser did not have a collegial working relationship. In their working interactions, Dr. Cheney was dismissive of Dr. Moser, used a belligerent tone when speaking to her, and minimized her. Dr. Cheney has treated other young female professors in the same manner, including Professor Carole Salmon (“Salmon”). Further, Dr. Cheney has commented to others within the department that she thought Dr. Moser looked pregnant and believed that Dr. Moser only wanted this faculty position to obtain the insurance.
Pursuant to the faculty contract, tenure-track faculty are reviewed annually in the areas of research, teaching, and service to determine whether their contract will be renewed for the following year. In April 2011, the personnel committee met to discuss the renewal of Dr. Moser’s contract for the 2012-2013 academic year. The committee was comprised of Dr. Cheney, the Cultural Studies Department Chair; Professor Herlinda Saitz, Professor of Spanish and Latin American Studies and Personnel Committee Chair; Dr. Frank, Associate Professor of Art History; and Dr. Sheiyl Postman (“Dr. Postman”), Professor of Spanish and Italian Studies and Culture. At the meeting, the committee was required to evaluate Dr. Moser’s performance in the three areas specified above and make a recommendation to the Dean concerning renewal. In making its recommendation, the committee was required to review Dr. Moser’s comprehensive vita (“CV”); existing annual and merit evaluations; alternative supplemental evaluations; rebuttals and written self-evaluations; existing individual academic plans; reports of classroom visits; student evaluations; and any other relevant support material submitted. As Dr. Cheney failed to submit her annual written evaluation of Dr. Moser before the specified deadline, Dr. Moser was unable to draft a rebuttal in time to submit for review at the committee meeting.[2]
On April 14, 2011, the committee sent a memorandum to Dr. Nina Coppens, Interim Dean of the College of Fine Arts, Humanities, and Social Sciences, communicating their recommendation not to reappoint Dr. Moser to her faculty position for the upcoming academic year. While all four members of the committee signed the memorandum, all four members did not actually agree with this recommendation. Professor Saitz and Dr. Postman testified in their depositions that the result of the committee vote was two in favor of reappointment and two against. Dr. Cheney came to them after this initial committee vote with the ■written memorandum, noting the committee’s recommendation not to reappoint, and told them that they were required to sign it.
On May 5, 2011, Dean Coppens informed Dr. Moser of the committee’s recommendation. Consequently, on May 18, 2011, Dr. Moser filed a grievance with the University concerning the personnel committee’s recommendation and the alleged irregularities in her performance evaluations and contract renewal proceedings. In her grievance, she claimed that Dr. Cheney did not complete her annual written evaluation within the required time period; that she was given a copy of this evaluation less than one week before the scheduled personnel committee meeting and thus did not have enough time to draft a rebuttal for submission at the meeting; that Dr. Cheney and Dr. Frank visited her class on multiple occasions but failed to provide her with a written evaluation of these visits; and that the personnel committee was not provided with her professional vita, syllabi, and other material related to her scholarly activities for consideration at its meeting. On June 13, 2011, after speaking with each of the personnel committee members, Dean Coppens informed Dr. Moser that she did not support Dr. Moser’s grievance.[3] Dr. Moser then appealed her grievance to Martin Meehan, Chancellor of UMass Lowell and filed a level two grievance through her union, the MSP.
In order to resolve the grievance, the university agreed to conduct a de novo review concerning Dr. Moser’s contract renewal. This agreement required Dr. Cheney, as Department Chair, to provide the personnel committee, the Dean, and the Provost with all of the required materials for the de novo review. These materials included those listed under Article IX, §F(l)(c) of the faculty contract.[4] As requested, Dr. Cheney sent materials listed under the agreement before the de novo personnel committee meeting.[5]
On August 22, 2011, the personnel committee convened to conduct their de novo review concerning Dr. Moser’s reappointment. As a result of the meeting, Dr. Cheney voted against reappointment, Dr. Frank abstained from voting, and Professor Saitz and Dr. Postman voted in favor of reappointment.
On August 30, 2011, Dean Coppens sent a memorandum to Provost Abdelal communicating her recommendation to him that Dr. Moser’s contract not be renewed for the 2012-2013 year. She indicated in her memorandum that she considered the personnel committee’s recommendation as well as all of the materials given to her, including rebuttals submitted by Dr. Moser.[6]
Dr. Moser requested further prose documentation from each member of the personnel committee concerning her recommendation for reappointment or non-reappointment. These written assessments addressed Dr. Moser’s specific qualifications regarding research, teaching, service, and collegiality. Dr. Cheney, the only personnel committee member who did not recommend Dr. Moser’s reappointment, wrote in her assessment that Dr. Moser’s teaching lacked critical analysis and that her service to the depart *224 ment, university, and community had been very limited.
Dean Coppens wrote to Provost Abdelal again on September 7, 2011 indicating to him that she reviewed each member’s written assessment, that these assessments were consistent with the information provided by the committee members following their initial vote in April, and that she again recommended non-renewal. Dr. Moser sent Provost Abdelal a rebuttal to the committee members’ assessments on September 7.
On September 10, 2011, Provost Abdelal sent a letter to Dr. Moser informing her of the University’s decision not to renew her contract for the 2012-2013 academic year. Provost Abdelal’s decision was based upon Dean Coppen’s recommendation and a cursory review of the materials provided to him, including Dr. Moser’s statements and rebuttals. Pursuant to the faculty contract, this non-renewal decision was final and not subject to grievance. Dr. Moser was the only faculty member in her department to be denied reappointment based upon concerns regarding teaching performance. While Professor John Christ, a male tenure-track assistant professor within the department, received “horrific” teaching evaluations, his contract was renewed for another year, and Dr. Cheney told the personnel committee that she would deal with his teaching performance on her own.
On December 23, 2011, Dr. Moser filed charges against UMass Lowell and Dr. Cheney with the Massachusetts Commission against Discrimination. On August 22, 2012, the MCAD issued a finding of lack of probable cause against UMass Lowell and Dr. Cheney for discrimination based upon sex. Dr. Moser did not appeal this decision. On October 15, 2012, she amended her complaint against Dr. Cheney, adding UMass Lowell as a defendant and this gender discrimination claim against both defendants.
DISCUSSION
A court must grant summary judgment where, when viewing the evidence in the light most favorable to the non-moving party, there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Brigade Leveraged Capital Structures Fund Ltd. v. Pimco Income Strategy Fund, 466 Mass. 368, 373 (2013). To meet her burden of proof, the moving party must support her motion with at least one of the materials listed in 56(c). Kourouvacilis v. General Motors Corp., 410 Mass. 706, 714 (1991), citing Celotex Corp. v. Catrett, 477 U.S. 317, 328 (1986) (White, J., concurring). “[A]lthough that supporting material need not negate, that is, disprove, an essential element of the claim of the party on whom the burden of proof at trial will rest, it will demonstrate that proof of that element at trial is unlikely to be forthcoming.” Id.
Once the moving party meets her burden, the non-moving party must provide specific facts to show that there is a genuine issue for trial. Kourouvacilis, 400 Mass. at 716. Unsupported contradictions of factual allegations are insufficient to raise questions of material fact sufficient to defeat a summary judgment motion. Madsen v. Erwin, 395 Mass. 715, 719 (1985).
In determining summary judgment motions, the court may consider pleadings, depositions, answers to interrogatories, admissions on file, and affidavits. Cataldo Ambulance Sew. v. Chelsea 426 Mass. 383, 388 (1998). While the court views the evidence in the light most favorable to the non-moving party, it does not weigh the evidence, determine the credibility of witnesses, or make its own findings of fact. Bailey, 386 Mass. at 370-71.
As the ultimate issue usually centers on a factual question of discriminatory intent, summary judgment is generally a disfavored remedy in the context of employment discrimination cases. Blare v. Husky Injection Molding Sys. Boston, Inc., 419 Mass. 437, 439 (1995). However, in cases where the “defendant’s motion . . . demonstrates that the plaintiffs evidence of intent, motive, or state of mind is insufficient to support ajudgmentin plaintiffs favor,” the court will grant summary judgment. Id. at 440.
A. The University
i. Cat’s Paw Theory
The University contends that Dr. Moser has offered no evidence to support her contention that gender bias was a motivating factor in any tier of the multi-level decision not to renew her contract. They assert further that, even assuming Dr. Moser could show that Dr. Cheney discriminated against her on the basis of her gender, she cannot prove a causal connection between Dr. Cheney’s alleged discriminatory animus and the University’s decision not to renew her contract. See Lipchitz v. Raytheon Co., 434 Mass. 493, 504 (2001) (concluding that plaintiff must show that defendant’s discriminatory animus was determinative cause of adverse employment action). Under the University’s decision-making process, Cheney was merely one of the four people who comprised the department personnel committee. This committee was responsible for making a recommendation to the Dean, who then made a recommendation to the Provost. The Provost then made the ultimate determination regarding renewal. Thus, the University argues that, because Dr. Cheney was not involved in making the final decision and because each member of the committee, the Dean, and the Provost all independently reviewed the materials submitted regarding Dr. Moser’s qualifications and performance, it made its ultimate decision independent of Dr. Cheney’s alleged discriminatoiy animus.
The plaintiff relies on the so-called cat’s paw theory, averring that, although Dr. Cheney did not make the ultimate decision regarding Dr. Moser’s contract renewal, Dr. Cheney’s discriminatoiy animus towards the plaintiff infected every level of the decision-making process and the false and misleading information Dr. *225 Cheney submitted to the Dean and Provost concerning the plaintiffs job performance materially influenced the ultimate decision.
In cases involving a multilevel decision-making process and neutral decision maker, an employer remains liable under c. 15 IB if a supervisor, motivated by discriminatoiy animus, provided the decision maker with inaccurate, misleading, or false information and the decision maker relied upon this information in forming his decision. Cariglia v. Hertz Equip. Rental Corp., 363 F.3d 77, 85-86 (1st Cir. 2004). However, “[t]he mere fact that a [discriminatory] supervisor provides some of the information on which a decision is based, or initially recommends the adverse employment action to someone higher up in the organization, does not necessarily mean that the decision maker lacks sufficient independence from the supervisor for these purposes.” Mole v. Univ. of Mass., 442 Mass. 582, 599 (2004). Thus, the plaintiff must show that the information provided by the supervisor “was a material and important ingredient in causing [the adverse employment action] to happen.” Cariglia, 363 F.3d at 88.
Dr. Moser has provided enough evidence to raise a dispute of fact as to whether Dr. Cheney drafted false and misleading evaluations that mischaracterized Dr. Moser’s job performance. In their written assessments of Dr. Moser following the de nooo personnel committee vote, Professor Saitz and Dr. Postman both state that Dr. Cheney’s evaluations, as well as her comments at the committee meetings, failed to convey a true depiction of Dr. Moser’s teaching abilities, downplayed the service activities Dr. Moser was involved in within the department as well as the University, and minimized the amount of research Dr. Moser was truly engaged in, which was apparent through looking at Dr. Moser’s CV. Further, both professors note Dr. Cheney’s attempts to taint the renewal process by not providing all of the necessary documentation, including student and professor evaluations, at the committee meetings, improperly influencing Dr. Frank to vote against Dr. Moser’s contract renewal, and failing to draft all of the required evaluations in a timely manner.
It is also disputed as to how much weight the Dean placed upon Dr. Cheney’s assessment of Dr. Moser. Although Dr. Cheney was the only committee member to vote against Dr. Moser’s reappointment and Dr. Cheney’s evaluations were the only ones to portray Dr. Moser’s job performance in a negative light, and notwithstanding being apprised by other committee members of Dr. Cheney’s attempts to sabotage the renewal process, Dean Coppens still made a recommendation against reappointment. It can be inferred that Dr. Cheney’s opinion weighed heavily in her determination as Dr. Cheney was the only person to vote against Dr. Moser and give her a negative review. The other committee members, even Dr. Frank, who voted against renewal in the first committee meeting and abstained from voting in the second meeting, stated that Dr. Moser’s performance in all three categories, teaching, research, and service, was more than sufficient to warrant reappointment. Provost Abdelal, who was charged with making the ultimate determination, admitted that, although he made an independent final determination, he placed great emphasis on the Dean’s recommendation. He also noted that Dr. Cheney’s characterization of the low enrollment in Dr. Moser’s classes was concerning for him and was a factor in his determination against reappointment. It is disputed, however, as to whether this characterization was in fact accurate.
Therefore, there is enough evidence on this record to raise a question of fact as to Dr. Cheney’s influence over the process as a whole and the Provost’s ultimate determination. This question is one for the juiy to resolve.
ii. Burden-Shifting Framework
General Laws c. 151B, §4(1) makes it unlawful “for an employer, by himself or his agent, because of the ... sex... of any individual to refuse to hire or employ or to bar or to discharge from employment such individual. . . unless based upon a bona fide occupational qualification.” Where, as here, the plaintiff does not offer any direct evidence of discrimination, the court employs the burden-shifting framework set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 793 (1973). See Wheelock Coll. v. Mass. Comm’n against Discrimination, 371 Mass. 130, 137-38 (1976) (adopting framework under state law); see also Abramian v. President & Fellows of Harvard Coll., 432 Mass. 107, 116 (2000).
Under the first stage, the employee must make out a prima facie case of discrimination. Id. To do so, Dr. Moser must show that (1) she is a member of a class protected by G.L.c. 151B (i.e., she is a woman); (2) she performed her job at a satisfactory level; (3) she was terminated; and (4) her employer replaced her with someone possessing similar skills and qualifications, or in a reduction in force (job elimination) case, circumstances suggesting an inference of discrimination. Sullivan v. Liberty Mut. Ins. Co., 444 Mass. 34, 41, 48 (2005). This showing “ ‘eliminates the most common nondiscriminatoiy reasons for the plaintiffs rej ection,’ which are lack of competence and lack of job availability, and thereby creates a presumption of discrimination.” Abramian, 432 Mass. at 116.
The defendants, for purposes of this motion, concede that Dr. Moser has met the first and third elements, i.e., that she is a woman who was terminated from her position. The overwhelmingly positive student evaluations as well as the positive evaluations from the personnel committee members, notwithstanding Dr. Cheney, evince that Dr. Moser was performing her job satisfactorily, meeting the second element. The defendants allege that Dr. Moser cannot satisfy the fourth element, as the University has never *226 attempted to refill her former position. However, Dr. Moser alleges that the University effectively filled her position by unilaterally hiring professor George Chigas, a male faculty member with similar qualifications. While the university considers Professor Chigas a non-tenure track lecturer and thus argues that he was hired for a different position than the one Dr. Moser was terminated from, there is evidence in the record to support that he became the Asian Studies professor within the department upon Dr. Moser’s termination. Therefore, although Professor Chigas did not fill Dr. Moser’s actual prior position, he in effect assumed the responsibilities she would have had if she had remained in her position. This effectual replacement, is sufficient to satisfy the fourth element. See Sullivan, 444 Mass, at 45 (noting that plaintiffs initial burden of establishing prima facie case is not intended to be onerous).
As Dr. Moser has established a prima facie case of discrimination, the burden shifts to the University to articulate a lawful, nondiscriminatoiy reason for its adverse employment action and to produce credible evidence to support that these reasons “were the real reasons.” Abramian, 432 Mass. at 116, citing Wheelock Coll, 371 Mass. at 138. This is only a shift in the burden of production, however, as the employee retains the burden of proving discrimination at all times, throughout the duration of the case. Shervin v. Partners Healthcare Sys., 2014WL 907696 at*19 (D.Mass. 2014), citing Dichner v. Liberty Travel, 141 F.3d 24, 29-30 (1st Cir. 1998).
The University’s renewal decisions of tenure-track faculty positions are based upon a multi-level evaluation of the faculty member’s performance in the areas of teaching, research, and service. In conducting this evaluation of Dr. Moser, it reviewed all of the materials submitted during the renewal process, including student evaluations, Dr. Cheney’s evaluations, Dr. Frank’s evaluations, Dr. Moser’s curriculum vitae, her class syllabi, the committee members’ written assessments of Dr. Moser, and Dr. Moser’s rebuttals to the evaluations and assessments. The University alleges that these materials demonstrated that Dr. Moser was performing inadequately in all three areas, particularly within teaching and service. Thus, based upon her performance, it chose not to renew her contract for the following year.
The University has met its burden of production. Therefore, “the presumption created by the prima facie case drops from the case,” Abramian, 432 Mass, at 117, and the burden shifts back to Dr. Moser to provide evidence showing that the University’s decision was based upon unlawful discrimination and the reason proffered was a mere pretext to cover up such discrimination. Sullivan, 444 Mass. at 54-55. Dr. Moser can accomplish this “by showing that the reasons advanced by the [University] for making the adverse decision are not true.” Abramian, 432 Mass. at 117; see Blare, 419 Mass. at 445 n.8 (where court noted smoking gun evidence as rare and held that plaintiff can prove discrimination through circumstantial evidence that convinces fact finder that defendant’s proffered explanation is not credible). However, to withstand summary judgment, the plaintiff must show something more than a conflict in evidence regarding the employer’s legitimate nondiscriminatory explanation for the employment decision and the plaintiffs membership in a protected group. Wooster v. Abdow Corp., 46 Mass.App.Ct. 665, 673 (1999).
Dr. Moser contends that the University's purported justification for their termination decision was false and that she in fact excelled in the areas of teaching, research, and service during her time as an assistant professor. There is credible evidence in the record to support this contention. For example, all of the evaluations from students as well as other colleagues represent Dr. Moser as a thoughtful, intelligent, and invested professor. The only negative evaluation she received came from Dr. Cheney. Further, Dr. Moser’s curriculum vitae demonstrates that she was working on a number of research projects that were based upon a myriad of topics while employed at UMass Lowell. Dr. Postman noted that Dr. Moser had considerably more scholarship activities on her CV than any other junior faculty member within the department. There is also evidence demonstrating that she was engaged in service to the department as well as to the University. For example, she collaborated with Professor Chigas to create a Southeast Asian Studies concentration within the Bachelor of Liberal Arts major; she collaborated with other departments on a project focused around National Identity; she attended and participated in departmental forums; she was a guest lecturer in classes at the University; and she offered to become a student advisor and help with Fall orientation, although her offer was ignored.
Further, she has also presented evidence, albeit slight, of disparate treatment of her and a similarly-situated male professor. Notwithstanding Professor Christ’s “horrific” teaching evaluations, the university chose to renew his contract for another year and Dr. Cheney specifically stated that she would work with him individually to improve his teaching. It could be argued that the criteria for renewal were not evaluated in the same manner in Professor Christ’s contract renewal proceedings as in Dr. Moser’s contract renewal proceedings. See Wooster, 46 Mass.App.Ct. at 671 (noting application of a certain criterion to employees not within protected category as relevant to determination of pretext). There is also evidence in the record that Dr. Cheney made a comment to Professor Saitz, another personnel committee member, concerning Dr. Moser’s possible pregnancy and how she felt that Dr. Moser only wanted this faculty position because of insurance benefits. This remark, coupled with the conflicting evidence of Dr. Moser’s job perfor *227 manee and disparate treatment of a similarly situated male faculty member, is enough to generate a genuine dispute of material fact as to pretext. See Blare, 419 Mass. at 446-47 (concluding that conflicting evidence of employee’s satisfactory performance, combined with remarks concerning employee’s ability to work and evidence that younger workers were not similarly disciplined was enough to raise genuine issue of material fact as to age discrimination); compare Tardanico v. Aetna Life & Cas. Co., 41 Mass.App.Ct. 443, 450 (1996) (court noted that “isolated or ambiguous remarks, tending to suggest animus based on [gender], are insufficient, standing alone, to prove an employer’s discriminatory intent”).
Accordingly, summary judgment is inappropriate. Blare, 419 Mass, at 445 (Once “a plaintiff has provided evidence sufficient to support a prima facie case of discrimination and has further offered evidence sufficient to support a determination . . . that the employer’s reason was a pretext. . . , summary judgment for a defendant is inappropriate”). A determination of the defendant’s true motive behind its adverse employment decision “is not for a court to decide on the basis of [briefs and transcripts], but is for the fact finder after weighing the circumstantial evidence and assessing the credibility of the witnesses.” Lipchitz, 434 Mass, at 499 (alteration in original and citation omitted).
Dr. Cheney
An individual may be held liable under G.L.c. 151B where that person “coerce[s], intimidate[s], threaten[s], or interfere[s] with another person in the exercise or enjoyment of any right granted or protected by [c. 151B] . . .” G.L.c. 151B, §4(4A). To prove interference, the plaintiff must show that the individual acted in a manner that was in “deliberate disregard” of those rights. Canfield v. Con-Way Frieght, Inc., 578 F.Sup.2d 235, 242 (D.Mass. 2008), citing Woodason v. Norton Sch. Comm. 2003 WL 554332 at *4 (MCAD decision 2003). “Deliberate disregard requires an ‘intent to discriminate.’ ” Id.; see Bendell v. Lemax, Inc., 2003 WL 1996271 at *3 (MCAD decision 2003) (construing term “interfere” to require a showing of discriminatory motive).
Dr. Cheney may be held individually liable, because Dr. Moser alleges that she was the perpetrator of the alleged discriminatory acts. Woodason, 2003 WL 554332 at *4 (liability can attach under §4(4A) where the individual is the alleged perpetrator of unlawful harassment or discrimination). Where the individual is the alleged perpetrator, she may be charged with “interfering with one’s exercise or enjoyment of the right to a non-discriminatory, harassment free, workplace.” Id. (emphasis in original). Dr. Moser’s discrimination claim against the university is premised entirely upon Dr. Cheney’s alleged discriminatory acts; her alleged comments to other faculty members concerning her belief that Dr. Moser looked pregnant and only wanted the position for its insurance benefits; her alleged preferential treatment of a similarly-situated male professor within the department; and the allegation that Dr. Cheney intentionally falsified evaluations and manipulated Dr. Moser’s contract renewal proceedings in order to ensure that the University would terminate Dr. Moser from her position. Without these alleged discriminatoiy actions, Dr. Moser’s claim against the University would be unsubstantiated. At this stage, Dr. Moser has presented enough evidence to support her individual claim against Dr. Cheney. Compare Bendell, 2003 WL 1996271 at *3 (noting that individual cannot be held liable for merely being the decision-maker or messenger of termination decision).
Alternatively, Dr. Cheney could be held individually liable under the circumstantial evidence test. In cases where there is only circumstantial evidence of discrimination, an individual employee may be held liable if:
a. [she] had the authority or the duty to act on behalf of the employer;
b. [her] action or failure to act implicated rights under the statute; and
c. [t]here is evidence articulated by the complainant that the action or failure to act was in deliberate disregard of the complainant’s rights allowing the inference to be drawn that there was intent to discriminate or interfere with complainant’s exercise of rights. Woodason, 2003 WL 554332 at *4.
As Chair of the Cultural Studies Department, Dr. Cheney had supervisory authority over Dr. Moser and was charged with preparing evaluations of her job performance and compiling and distributing all of the materials for review during her contract renewal. There is evidence to support the contention that Dr. Cheney’s actions against Dr. Moser implicated Dr. Moser’s right to work free of unlawful discrimination. Dr. Cheney allegedly made comments concerning Dr. Moser’s appearance and a possible pregnancy. She also allegedly treated Dr. Moser and other young female professors particularly poorly. There is evidence in the record which shows that Dr. Cheney gave preferential treatment to a male tenure-track assistant professor and even championed for his contract renewal when other personnel committee members were concerned that he was, in fact, a poor teacher. This stands in stark contrast to Dr. Moser’s case where there is evidence in the record to show that Dr. Cheney attempted to sabotage the contract renewal process. A jury could find that Dr. Cheney deliberately falsified her evaluations of Dr. Moser, failed to distribute all of the required materials to personnel committee members, and attempted to threaten and coerce other personnel committee members into voting against Dr. Moser’s renewal, all to ensure that the Universfiy would not reappoint Dr. Moser as an assistant professor. This constellation of factors raises a question of fact as to whether Dr. Cheney acted in deliberate *228 disregard of Dr. Moser’s right to work free of unlawful discrimination.
With this set of factual circumstances, summary judgment is not warranted.
ORDER
For these reasons, the defendants’ motion for partial summary judgment is DENIED.

The agreement referred to is the collective bargaining agreement between UMass Lowell and the Massachusetts Society of Professors (“MSP”), Moser’s union.

It is disputed as to whether Dr. Cheney provided all of the required documents for review at the meeting.

It is disputed as to whether Dean Coppens actually considered all of the information she received from committee members concerning Dr. Moser’s contract renewal when coming to her decision.

As noted above, these include: Dr. Moser’s comprehensive vita; existing annual and merit evaluations; alternative supplemental evaluations; rebuttals and written self-evaluations; existing individual academic plans; reports of classroom visits; student evaluations; and any other relevant support material submitted.

It is disputed as to whether Dr. Cheney sent all of the required materials before the de novo committee meeting and whether her evaluations, which were part of these materials, conveyed an accurate depiction of Dr. Moser’s qualifications and performance as an assistant professor.

It is disputed, however, as to whether, in reaching her recommendation, she placed greater emphasis on Dr. Cheney’s vote against reappointment and Dr. Cheney’s assessment of Dr. Moser.